Philadelphia, Appellant, *v.* Pennsylvania Public Utility Commission et al.

Argued October 11, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*G. Coe Farrier,* with him *Abraham Wernick,* Assistant City Solicitors, and *Frank F. Truscott,* City Solicitor, for appellant.

*Charles E. Thomas,* with him *Lloyd S. Benjamin* and *Thomas M. Kerrigan,* for appellee.

*Hamilton C. Connor, Jr.,* with him *Allen Hunter White, Frederic L. Ballard* and *Ballard, Spahr, Andrews & Ingersoll,* for intervenor appellee.

OPINION BY RHODES, P. J., January 14, 1949:

On February 19, 1948, the Philadelphia Transportation Company, intervening appellee, filed new tariffs with the Pennsylvania Public Utility Commission initiating increased bus and rail fares. In general, the new tariff provided that the 10 cent cash or 8¾ cent token fare on rail, motorized rail and trackless trolley lines be increased to a 10 cent straight cash fare; that the 10 cent cash fare on certain bus lines be increased to 12½ cent ticket or token or 13 cent cash fare; that the 10 cent transfer involving interchange be increased to 12½ cent token exchange or 13 cent cash exchange; and that the 5 cent suburban zone cash fare be increased to 7 cents with no change in zones.

Under section 308 (a) of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS § 1148, and the Commission's regulation of June 1, 1937, permitting changes in rates to become effective upon thirty days' notice unless otherwise directed, the proposed increased rates were to become effective March 21, 1948.

It appears that the primary reason set forth by the company for seeking higher fares was an increase in labor costs of $5,500,000 under a labor contract, effective

February 11, 1948, together with other estimated increases in operating expense of about $1,400,000. The City of Philadelphia, on February 26, 1948, filed its complaint (Complaint Docket No. 14336) with the Commission in which it challenged the reasonableness of the proposed rates and requested the Commission to suspend the effective date thereof. At that time there were pending in this Court appeals from previous orders of the Commission, dated January 29, 1947, wherein the Commission, after an investigation on its own motion, had approved an increase in rates of the same utility. That increase became effective, following orders of suspension by the Commission, on February 5, 1947. On February 27, 1948, the City petitioned this Court to remand the record in those pending appeals for consolidation with any proceedings the Commission might institute in connection with the City's complaint to the proposed second increase in rates. On March 16, 1948, we refused the City's petition to remand, discharged the rule, and filed our decision in the then pending appeals affirming the orders of the Commission (*Philadelphia v. Pennsylvania Public Utility Commission*, 162 Pa. Superior Ct. 425, 57 A. 2d 613). On the same day, March 16, 1948, the Commission refused the City's request to suspend the effective date of the new tariffs, which thereupon became effective on March 21, 1948. The Supreme Court of Pennsylvania refused the City's application to take original jurisdiction and restrain application of the proposed rates.

Thereafter, on March 19, 1948, by complaint filed in the United States District Court for the Eastern District of Pennsylvania, the City sought to enjoin the company from collecting the rates and charges in its tariffs of February 19, 1948, until final hearing and determination by the Commission as to their justness and reasonableness unless the company issued to each passenger a reparation slip and segregated in a separate fund the

excess paid over the then existing rate of fare. The proceeding in the District Court terminated April 15, 1948, by a stipulation between the City and the company, and a consent decree was entered wherein the company agreed to continue the issuance of the reparation slips and the impounding of the excess fare until the Commission entered its final order upon the City's complaint.

At the first hearing before the Commission in the present proceeding on April 1, 1948, the City filed a motion to set aside the tariffs and suspend the rates for the following reasons: (1) That under section 308 (a) of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS § 1148, the company should have given sixty days' notice of its intention to change its rates; (2) that section 308 (b) of the Public Utility Law, 66 PS § 1148, made it mandatory on the Commission to suspend the proposed rates upon the filing of a formal complaint; (3) and that the 1907 Agreement between the City and the company's predecessor, Philadelphia Rapid Transit Company, provided that no change of rate shall be initiated by the company without the consent of the City. Further hearings were held by the Commission during April and May, 1948. The Commission, on June 16, 1948, filed its final order, wherein it found that the new rates were just and reasonable, that the return to be realized under the new tariffs would not be excessive upon any finding of fair value which the Commission would be justified in making, and that there was no unjust discrimination between the several classes of users of the company's service. Accordingly, the Commission dismissed the City's complaint. This appeal by the City is from that order.

The first complaints of the City on this appeal relate to the alleged failure of the Commission to comply with section 308 (a) and section 308 (b) of the Public Utility Law.

It is the contention of the City that section 308 (a) of the Law requires the company to give sixty days' notice of an intention to change its rates; and that the Commission's regulation permitting the filing of new tariffs upon thirty days' notice is a violation of section 308 (a) and a denial of due process. Section 308 (a), 66 PS § 1148, provides as follows:

"(a) Unless the commission otherwise orders, no public utility shall make any change in any existing and duly established rate, except after sixty days' notice to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force, and the time when the changed rates will go into effect. The public utility shall also give such notice of the proposed changes to other interested persons as the commission in its discretion may direct. All proposed changes shall be shown by filing new tariffs, or supplements to existing tariffs filed and in force at the time. The commission, for good cause shown, may allow changes in rates, without requiring the sixty days' notice, under such conditions as it may prescribe."

In its regulation dated June 1, 1937, the Commission, after reciting section 308 (a) of the Law, continued as follows:

"And Whereas, the Interstate Commerce Act permits the filing of changes in tariffs of common carriers upon thirty days' notice.

"And Whereas, it appears desirable that there should be uniformity, so far as practicable, in the rules, regulations and practices of common carriers which are subject both to the jurisdiction of the Interstate Commerce Commission and this Commission, and also in the rules, regulations and practices of common carriers subject to the exclusive jurisdiction of this Commission;

"Now, to wit, June 1, 1937, it is ordered: That all common carriers are hereby permitted to file changes in rates upon thirty days' notice to the Commission and the

public, unless otherwise directed." See section 901 of the Public Utility Law, 66 PS § 1341.

We are of the opinion that the legislature, in section 308 (a) of the Law, intended to allow the Commission certain latitude and discretionary power in fixing the extent of notice where a utility initiates a change in rates; and that the Commission acted within its powers in permitting a change of rates to become effective upon thirty days' notice in the present proceeding. The language of the section is clear and would seem to permit of no other construction, aside from the probability of disruptive results from a contrary view. Such notice was reasonable, under the circumstances, and does not violate procedural due process.

The City asserts that, under section 308 (b) of the Law, 66 PS § 1148, it is mandatory upon the Commission to grant a hearing where a complaint is filed, and that the Commission must suspend new rates pending hearing and determination of a complaint. Section 308 (b) provides:

"(b) Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission, upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act. The commission shall consider

the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility."

The Commission granted a full and complete hearing in the present case; consequently, the question of whether it must do so in all cases where a complaint is filed does not arise. It is argued, in effect, that the Commission was bound to suspend the rates to the extent the statute permitted, pending determination of their reasonableness. Section 308 (b), which gives the Commission the power to suspend, must be construed in the light of the general purpose of the grant. Ordinarily, the exercise of the power of suspension must depend upon many factual matters, including the probability of whether the new rates will ultimately be held reasonable. We think it is plain that the exercise of the statutory power of suspension of new tariffs is primarily an administrative function, and within the sound discretion of the Commission. It has been so held in relation to a similar power to suspend rates granted to the Interstate Commerce Commission under section 15 (7) of the Interstate Commerce Act (49 U. S. C. A. § 15 (7). *M. C. Kiser Co. v. Central of Georgia Railway Co.* (D. C. Ga. 1916), 236 F. 573, 577, affirmed (C. C. A. 1917), 239 F. 718; *Algoma Coal & Coke Co. v. United States,* 11 F. Supp. 487. It is evident, from the language used in section 308 (b), that the power of the Commission to suspend is a discretionary power. When we consider the general purposes and the objectives of the Public Utility Law, it is apparent that the word "may" is here used in the permissive sense, and not in the mandatory sense of "shall," as the City contends. Cf. *Baldwin Appeal,* 153 Pa. Superior Ct. 358, 33 A. 2d 773; *Com. ex rel. Duff v. Eichmann,* 353 Pa. 301, 45 A. 2d 38. Moreover, the Commission, as an administrative body, has access to all facts essential to an initial determination of the necessity for a suspension. It is not open to question that in some instances the public interest may require that the

power of suspension be held in abeyance. At other times it is equally true that new rates should be suspended pending further consideration and investigation. In the present case, the Commission had the benefit of the former rate increase proceeding recently before it, and, as indicated in its final order, it gave serious and careful consideration to the question of suspension. It finally determined that, in this case, "it would be in the interest of the patron and the utility to permit the proposed tariffs to become effective pending conclusion of the complaint proceeding."

In any event, in the present proceeding, the rights of the public were amply protected by the consent decree obtained in the District Court. Thereby the company was required to issue rebate slips and segregate all funds representing fare increases. We are not obliged to determine whether the Commission had power to afford similar relief, or what remedies might have been available to protestants in the courts generally. Under the circumstances, it cannot be said that the failure of the Commission to exercise its power of suspension was violative of procedural due process as to protestants in this case. Their rights were given due cosideration and a full hearing was afforded. The demands of due process do not require a hearing at any particular point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective. *Womelsdorf Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 160. Pa. Superior Ct. 298, 304, 50 A. 2d 548.

The City's further contention is that the new rates will produce more than a fair return to the company, and that they are therefore unreasonable. In arriving at a conclusion to the contrary, the Commission had before it the company's figures as to the results of operation for the year ending December 31, 1947. As adjusted by the Commission, the result showed total revenues of $63,584,000, and expenses, including depreciation and taxes, of $60,503,000. Thus a balance of

$3,081,000 would be available towards a fair return. The expenses for 1947, as adjusted, included an increased labor cost of $4,000,000 incurred as a result of a labor contract effective February 11, 1947. As of February 11, 1948, the company entered into a new wage contract with its employes providing for an increase amounting to $5,500,000 annually. Additional estimated increase in operating expense was the sum of $1,419,000 for electrical power, gasoline and maintenance material.

The company estimated an increase in annual revenue under the new tariffs of $6,665,000. This estimate was based on a formula which takes into account the fact that an increase in fares would bring a percentage reduction in the number of passengers carried. The company's analysis showed total estimated revenues for 1948 of $70,397,000, which, less total estimated expenses of $66,626,000, plus certain non-operating income, would produce $3,823,000 available towards a fair return. Actual experience for 1948 probably will result in some modification of all the estimates.

The City, on the other hand, as shown in its exhibits C 31 and C 32, estimated an annual revenue for the company under the new fares of March 21, 1948, of $67,900,000. To this the City added $1,991,811 for non-operating revenue, thus making a total income of $69,891,811. The City estimated that the expenses of the company for 1948 would be $63,369,481, whereby $6,522,330 would be available toward a fair return. The City's forecast of the amount which would be available towards a fair return was adjusted downward by the Commission to $4,315,000. In making this adjustment the Commission reviewed in detail the various items of operating expense enumerated by the City, and pointed out wherein these items were patently erroneous or inadequate. For instance, the City underestimated in a very substantial amount the income tax which the company would be obliged to pay on the basis of the City's estimates.

The Commission, after comparing the company's estimate of a return of $3,823,000 for 1948, with the City's estimate of $4,315,000, as corrected by the Commission, concluded: "In light of all the evidence we cannot find that either amount is an excessive return upon any finding of fair value we would be justified in making. We cannot find that the present rates are unjust or unreasonable in violation of Article III, Section 301 of the Act of May 28, 1937 [P. L. 1053], and, accordingly, the complaint with respect thereto must be dismissed." As in the former appeal (162 Pa. Superior Ct. 425, 430, 57 A. 2d 613), a finding of fair value by the Commission was not necessary or desirable. The company submitted various measures of value all of which were higher than those submitted by the City. The Commission had before it sufficient evidence of value to enable it to conclude that a definite finding of fair value was not necessary and to act finally without it.

The City submitted, at most, only two estimates of value. In the record on the former appeal (162 Pa. Superior Ct. 425, 57 A. 2d 613), which is also made a part of the record in the instant appeal, the City's engineer estimated the original cost of construction or acquisition of the company's used and useful property, less purported depreciation reserves, to be approximately $75,000,000. The Commission previously rejected this estimate on the ground that it failed to take into consideration many of the necessary elements of value. The only estimate of value submitted directly by the City in the present proceeding, resulted, when adjusted by the Commission, in a figure of $88,445,000. This valuation at 6½ percent would give an annual return of $5,749,000. The City's estimated return, adjusted by the Commission to $4,315,000, would, as applied to the City's figure adjusted by the Commission to $88,445,000, produce a rate of return of 4.9 percent. In its brief, the City asserts that the rate base for the operation of the company as adjusted should not be in excess of $80,000,000; a rate

of return of 6 percent, which the City contends is all that the company is entitled to, would produce $4,800,000. We are obliged to conclude that the evidence supports the findings of the Commission that the rates are not unlawful.

Finally, the City says that the suburban bus lines of the company, under a 7 cent fare zone, operate at a loss, which fact constitutes unlawful discrimination against city riders, in violation of Article III, § 304 of the Act of May 28, 1937, P. L. 1053, 66 PS § 1144. In support of this allegation the City presented certain exhibits and estimates which tended to show that, considered separately, most of the suburban bus lines were operated at a loss. The Commission analyzed this evidence and concluded (1) that the City's attempt to divide the entire system of the company into individual line operation as to cost was far from accurate, and (2) that, even assuming the suburban bus lines were less profitable, such inequality as existed did not amount to or constitute unlawful discrimination. Our statement in the former appeal (162 Pa. Superior Ct. 425, 431, 432, 57 A. 2d 613), in answer to a similar contention by the City, applies equally here. As the Commission stated, the entire coordinated system of the utility must be considered as a unit. It is not required that the rates of a public utility for different classes of service be either uniform or equal, or even equally profitable to the utility; the rates for one class of service shall not be unreasonably prejudicial or disadvantageous to the users of any other class of service. *Carpenter v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 447, 450, 15 A. 2d 473.

The order of the Commission is affirmed.