Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

96

Argued October 6, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Anne X. Alpern,* City Solicitor, with her *John M. Marshall,* Assistant City Solicitor, for appellant.

*Charles E. Thomas,* with him *John E. Fullerton,* for Pennsylvania Public Utility Commission, appellee.

*C. K. Robinson,* with him *William Anderson,* for intervening appellees.

*Julius J. Strba,* amicus curiae.

OPINION BY RHODES, P. J., January 12, 1951:

These appeals by the City of Pittsburgh are from the order of the Pennsylvania Public Utility Commission of July 25, 1950, allowing further increases in fares for street railway, incline plane, and feeder and street car type bus service of Pittsburgh Railways Company,[1] and for through-bus service of the Pittsburgh Motor Coach Company, a wholly owned subsidiary of Pittsburgh Railways Company.

On November 19, 1948, the Trustees of Pittsburgh Railways Company and of Pittsburgh Motor Coach Company filed tariff increases with the Commission under which the basic street car fare was increased from 10 cents to 12 cents, and the through-bus fare from 12½ cents to 15 cents. The Commission, by its orders of June 15, 1949, permitted such increases. The City of Pittsburgh appealed from those orders of the Commission to this Court, and we directed that the appeals should operate as a supersedeas. On November 15, 1949, we terminated the supersedeas, vacated the orders of the Commission, and remanded the matter to the Commission for further proceedings. *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 69 A. 2d 844. The increased fares under the tariffs filed November 19, 1948, became effective on November 23, 1949. Beginning December 14,

---

[1] See *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 523, 69 A. 2d 844, as to operation of the various facilities.

1949, the Commission conducted further hearings on the matters then before it. Meanwhile, on January 4, 1950, Railways and Motor Coach filed new tariffs which made further increases and changes in fares to become effective February 4, 1950. Such new tariffs provided for an increase in the basic street car fare from 12 cents cash to 15 cents plus a 1 cent transfer, or 8 tokens for $1 (12½ cents) plus a 1 cent charge for transfer. The bus tariff increased the cash fare from 15 cents to 20 cents or 10 tickets for $1.50. Complaints against the proposed increases were filed by the City of Pittsburgh and others. The Commission suspended the effective date of the proposed tariffs from February 4, 1950, to August 4, 1950. The proceedings relating to the new rates as proposed by both companies were consolidated by order of the Commission for the purpose of hearing with those proceedings which followed the remission of the record to the Commission by this Court on the former appeals (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 69 A. 2d 844).

The Commission by its order of July 25, 1950, found that the proposed rates would not yield an excessive return upon any finding of fair value and fair rate of return thereon that the Commission would be justified in making. The Commission concluded, however, that the 1 cent transfer charge and the basic street car fare (15 cent cash or 12½ cent token) discriminated in favor of those using transfers as compared to the single vehicle passenger. Accordingly the Commission ordered Railways to revise its tariff, canceling the proposed 12½ cent token fare and the proposed 1 cent transfer charge and all proposed 15 cent cash fares and substituting therefor a 12 cent token fare available at five for 60 cents and a 3 cent charge for transfers, and a 15 cent cash fare which should include the transfer at no additional charge. It appears that the increase

in the transfer charge from 1 to 3 cents was made by the Commission in order to retain the basic fare at the token rate of 12 cents with a return substantially equivalent to that provided for in the proposed tariffs.

The City appealed to this Court from the Commission's order of July 25, 1950, and at the same time petitioned for a supersedeas. On August 2, 1950, we granted a rule to show cause why the appeals should not operate as a supersedeas. After hearing on August 10, 1950, we refused a supersedeas upon the condition that Railways issue reparation slips covering the 3 cent transfer charge pending final disposition of the appeals.

The City's present contentions relate in part to matters within the administrative discretion of the Commission and to possible conditions which may or may not arise. The position of the City advanced in the former appeals as to consideration being given to zoning and to a more equitable distribution of transportation costs has been recognized by the Commission as well as the specific suggestions of this Court in remitting the record in the prior proceedings. In any event, we may set aside the present order of the Commission only "for error of law or lack of evidence to support the finding, determination, or order . . ." Section 1107 of the Act of May 28, 1937, P. L. 1053, as amended by the Act of July 3, 1941, P. L. 267, §3, 66 PS §1437.

The City asserts that the rates established by the Commission's order of July 25, 1950, are unfair and discriminatory. According to the City, the 3 cent transfer charge in particular is arbitrary, excessive, and unreasonably discriminatory in that such charge is neither related to the length of the ride nor based on the service provided. In considering a schedule of rates that would be equitable and non-discriminatory to all classes of service, the Commission had before it testimony as to several different rate structures. One such rate struc-

ture, set up in a questionnaire submitted by the Commission to Railways, was based on the establishment of an initial 10 cent zone within a circle four miles in radius from the center of downtown Pittsburgh with a 5 cent charge for each additional zone. There was testimony that such a rate structure would not be justifiable because (1) it would radically disturb the historic fare pattern of Railways and seriously change the traveling habits of the people; (2) it would substantially increase operating costs by complicating fare collections and by slowing down the operating schedules; (3) a charge as high as 5 cents for transfers, as well as the establishment of absolute fare limits, would result in disproportionately high rates for certain classes of riders and for many sections of the City. There was also testimony that Railways, before filing the new tariffs on January 4, 1950, gave consideration to various rate structures. Consideration was given to (1) a straight 13 cent cash fare with free transfer; (2) 15 cent cash fare or 5 tickets for 65 cents with free transfers; (3) 13 cent cash fare or 8 tokens for $1 and a 2 cent transfer charge; (4) 15 cent cash fare or 8 tokens for $1 and a 1 cent transfer charge, which were embodied in the tariff filed January 4, 1950.

In determining whether rates are unreasonably discriminatory the administrative agency must be granted an area of discretion.[2] Absolute equality between classes of service is a practical impossibility. Rates for different classes of service need not be uniform or equal or equally profitable to the utility; the prohibition is against

---

[2] "The rate-making power is a legislative power and necessarily implies a range of legislative discretion." *Minnesota Rate Cases* (*Simpson v. Shepard*), 230 U.S. 352, 33 S. Ct. 729, 57 L. Ed. 1511.

"Rate making . . . is never a mathematical application of a theoretical principle." Re Rates and Rate Structures of Corporations Supplying Electricity in New York City. New York Public Service Commission, P.U.R. 1931c, 337.

unreasonable or undue discrimination in the application of the rates. *Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 107, 63 A. 2d 391; *Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 447, 450, 15 A. 2d 473. Under the tariffs as filed by Railways and Motor Coach and the rate structure prescribed by the Commission's order there were at least three variable factors: (1) Price of cash fare; (2) price of tokens; and (3) price of transfers. These variables are related to each other and to the whole rate structure. There is a fundamental relationship between the basic fare (12 cents by token) and the 3 cent transfer charge. On this point the Commission stated in its order: ". . . respondents' proposed fare structure does not adequately take into account the cost of providing the service for the multiple vehicle rider as distinct from the single vehicle rider. If this additional cost is continued to be embraced in the single vehicle base fare, that fare may rise to prohibitive heights and tend to drive riders away from the system. For this reason we believe that respondents' proposed 1¢ charge for transfers should be materially increased." It appeared from the evidence that the basic fare represented approximately 80 per cent of the total revenues of the trolley system, and that the 12 cent basic fare entitled the rider to a free transfer. Obviously the proper apportionment of costs and charges to the various types of service, like many other factual issues, is an engineering or accounting problem, and as such peculiarly within the area of administrative discretion. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 166, 174, 63 A. 2d 466. In so far as the reasonableness of the basic fare and transfer charge is factual or an administrative question, we cannot disturb the Commission's findings thereon if supported by competent and substantial evidence. *American Lime & Stone Co. v. Public Service Commission,*

100 Pa. Superior Ct. 158, 164; *Carpenter v. Pennsylvania Public Utility Commission,* supra, 141 Pa. Superior Ct. 447, 452, 15 A. 2d 473; *Aizen v. Pennsylvania Public Utility Commission,* 163 Pa. Superior Ct. 305, 313, 60 A. 2d 443; *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 320, 326, 64 A. 2d 500. The Commission's findings were supported by such evidence which included the testimony of various experts as to desirable rate structures. On the record before us the Commission could exercise its administrative discretion and retain the basic fare (12 cent token) and adopt a 3 cent transfer charge. It could conclude upon the evidence taken at the hearings that this was required to produce a proper and equitable rate schedule. See *Metropolitan Edison Co. v. Public Service Commission,* 127 Pa. Superior Ct. 11, 22, 191 A. 678. It follows that the rate schedule established by order of the Commission was entirely within "the flexible limit of judgment which belongs to the power to fix rates." *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 530, 69 A. 2d 844, 850.

The City also complains that the Commission failed to find the fair value of Railways for rate purposes in this proceeding. The City argues that the Commission blindly accepted the figures which in the past it had thought appropriate to the utility, and that there should have been a finding of fair value for the reorganized company. We may note here that a finding of fair value, in a case in which such finding was necessary, would be based on the properties used and useful in the public service, and would not be dependent upon the corporate structure.

In the previous proceeding and appeal, *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 524, 69 A. 2d 844, the Commission found a fair value of Railways for rate making pur-

pose of $50,000,000, and allowed a 6½ per cent rate of return. In the present proceedings the Commission considered various measures of value, estimated the probable rate of return, and concluded that neither the actual return nor the anticipated return would be excessive based on any finding of fair value which the Commission would be justified in making.

Railways submitted as measures of value a depreciated original cost as of October 31, 1949 (including allowances for materials, supplies, and cash working capital) of $47,235,257, and a depreciated reproduction cost, using a five-year price level ending October 31, 1949, of $68,686,033. The Commission found, with respect to Railways, five measures of value as of October 31, 1949: (1) Depreciated original cost $46,412,259; (2) depreciated reproduction cost based on price levels as follows: (a) year ending October 31, 1949, $78,-437,575; (b) three years ending October 31, 1949, $73,-917,255; (c) five years ending October 31, 1949, $67,-656,176; (d) ten years ending October 31, 1949, $58,-166,467. These amounts include the allowances for materials, supplies and cash working capital. Certain items previously the subject of controversy now are excluded—namely, 64 old type street cars having an original cost of $920,537, and 2 routes which had been abandoned. The properties of the through motor coach routes are not included.

The Commission found that future annual operating revenues of the reorganized company under the proposed fares would be $28,214,128, and that the operating expenses would amount to $25,936,267, leaving $2,277,861 available for return; and that under the then existing fares the amount available for return would be about $717,000. The Commission also found that if Railways were to be considered under its then existing corporate structure, the income available for return under the proposed fares would be $3,063,766,

and under the then existing fares $566,000. The change in previous estimates under the then existing fares results from a continuing decline in riders and a major increase in wages and salaries. Although it made no specific finding as to rate of return, the Commission stated: ". . . the record amply supports our finding of 6.5 percent contained in our order of June 15, 1949." The Commission concluded that the anticipated income available for return would not be in excess of a fair return upon any finding of fair value which the Commission would be justified in making whether Railways be considered under its then existing corporate structure or as a reorganized entity. The Commission's findings on the various measures of value are fully supported by the evidence. A finding of fair value is not required in every case; the Commission had sufficient evidence before it to act finally without such finding. *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 430, 57 A. 2d 613; *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 164 Pa. Superior Ct. 96, 106, 63 A. 2d 391.

In its brief the City refers to the valuation of $22,-283,000 placed upon Railways by an engineering firm in the reorganization proceedings, and the valuation of $17,000,000 placed upon Railways by the Division of Public Utilities of the Securities and Exchange Commission, and emphasizes the spread between these figures and the measures of value as found by the Commission, and the Commission's previous fair value finding of $50,000,000 in its order of June 15, 1949. The Commission in its present order recognized the disparity between its previous valuation of $50,000,000 and these lower valuations suggested in the reorganization proceedings. But the Commission pointed out that the latter were valuations made from an investor's standpoint based on a capitalization of earnings to

be realized under a given set of fares. Such values may be considered as factors in determining fair value, but they are not conclusive (*Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 160 Pa. Superior Ct. 458, 463, 51 A. 2d 497), and of course they are not binding upon the Commission in the present proceedings.

The City again contends that Railways, by repeated increases in fares, is rapidly pricing itself out of the mass transportation field. The Commission recognized in these proceedings, as it did in the former proceedings (*Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 165 Pa. Superior Ct. 519, 528, 529, 69 A. 2d 844), that the law of diminishing returns applies to rate increases. In the present proceedings the Commission followed the general experience estimate of such decline, namely, a one-quarter per cent decline for each one percent increase in fare. However, it is plain from the tables showing the number of passengers carried monthly during 1948-1949 and the first eight months of 1950 that some of the decline in the number of passengers carried occurred without relation to increased fares, and was attributable to other causes. It may be that Railways is reaching a point where increased fares will yield a smaller rather than a greater net return. We made reference to this in *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 165 Pa. Superior Ct. 519, 528, 529, 69 A. 2d 844. And it may be, as the City says, that the solution to the transportation problem and its increased operating costs does not lie in increased fares.[3] But the fact remains that

---

[3] "We are not unmindful of the argument . . . that the effect of lower prices may be to swell the volume of the business, and by thus increasing revenues enhance the ultimate return. Upon the record as it comes to us, this is guesswork, and no more": *West Ohio Gas Co. v. Public Utilities Commission*, 294 U.S. 79. 82. 55 S. Ct. 324. 79 L. Ed. 773, 777.

the question of the reasonableness of rates and the rate structure, in so far as it concerns the various economic factors involved, lies primarily within the field of administrative action. In order to function in the public interest, the rates of a utility must be such as to cover legitimate operating expenses, and at the same time not result in an excessive return upon the fair value of the property devoted to the public use. In forecasting probable future revenues under a given tariff, the Commission must necessarily have the power to exercise its own judgment "upon a view of all the relevant circumstances." See *State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 985; *Blue Mountain Telephone Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 327, 67 A. 2d 441; *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 466, 51 A. 2d 497. No question of confiscation or constitutional rights is involved in the present case, and consequently our power to interfere with the order of the Commission is limited to errors of law or lack of evidence to support the Commission's findings. *Pittsburgh v. Pennsylvania Public Utility Commission,* 158 Pa. Superior Ct. 229, 235, 44 A. 2d 614; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 524, 69 A. 2d 844. We are not at liberty to substitute our own judgment or discretion for that of the Commission which has kept within the bounds of its administrative power. *American Telephone & Telegraph Co. v. United States,* 299 U. S. 232, 57 S. Ct. 170, 81 L. Ed. 142; *American Lime & Stone Co. v. Public Service Commission,* supra, 100 Pa. Superior Ct. 158, 164. These observations apply likewise to the City's claim that the Commission failed to consider the intensified national defense program, its beneficial effect upon Pittsburgh industry, and the con-

sequent increase in the revenues of Railway to a point where rates could be reduced rather than increased. Should conditions eventually change and revenues increase so as to warrant a decrease in rates, application may be made to the Commission for such reduction. Cf. *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 475, 51 A. 2d 497.

Finally, the City contends that the Commission in its consideration of accrued depreciation failed to recognize or consider functional obsolescence. The City's view is based upon the premise that there is a high element of obsolescence, particularly in street railway equipment, and upon the testimony of its expert, Dr. John Bauer, to the effect that the entire street railway system was largely obsolete and should be abandoned in favor of bus transportation over a period of the next five years. As to this the Commission found: "The record in these proceedings clearly indicates that no major abandonments are presently contemplated either immediately before or immediately following reorganization . . . . Whatever exclusions may be made in the future, if made at all, are presently only a matter of conjecture and, if made may take years for consummation. In the matter of any substitution of bus for rail, any estimates of costs of operation of the substituted facilities and any estimates of revenues from the substituted service can also at this time be only a matter of conjecture and not of firm estimate." Moreover, the record before us on these appeals shows that the Commission considered the question of accrued depreciation at length and in detail, including the subsidiary problem of functional obsolescence. The Commission pointed out that Railways used two bases for determining accrued depreciation and the per cent condition of its property, one being future life and average service life, and the other being physical inspection. The

Commission rejected Railways' claims for accrued depreciation, which were based on physical inspection, on the ground that these estimates "did not include the critically important elements of obsolescence, inadequacy, . . . and planned retirements." The Commission accordingly determined accrued depreciation solely on the basis of condition per cent by the future life and average service life method. See *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 393, 401, 68 A. 2d 448. The results reached for accrued depreciation by age-life estimates were: (1) $28,117,414 or 38.90 per cent applicable to original cost; (2) $62,485,929 or 45.06 per cent applicable to one-year average price reproduction cost; (3) $58,651,536 or 45 percent applicable to three-year average price reproduction cost; (4) $53,348,657 or 44.92 per cent applicable to five-year average price reproduction cost; and (5) $45,753,927 or 45 per cent applicable to ten-year average price reproduction cost. It is thus apparent that the Commission did give consideration to obsolescence as an element in accrued depreciation. It is true that the Commission did not give that weight to the element of obsolescence for which the City contends or accept the theory of its expert. But here again the matter was one for the exercise of judgment by the Commission. Accrued depreciation, including the weight to be given to the element of obsolescence, is essentially a judgment figure. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 402, 68 A. 2d 448; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 526, 69 A. 2d 844. The Commission's findings on accrued depreciation are fully supported by the evidence.

Railways has included as part of its property and results of operations the property of Motor Coach devoted to feeder and street car type bus service and the

results of operation thereof, thus limiting consideration of Motor Coach to the property and operations related to through-bus operation. The same measures of value were submitted for Motor Coach as for Railways and the Commission made its own findings and applied the same principles as were applied to Railways. The Commission found that Motor Coach had a depreciated original cost of $319,517, including allowances for material, supplies and cash working capital, and that the depreciated reproduction cost, including similar allowances, ranged from $307,544 at the aver-·age prices for the ten years ending October 31, 1949, to $385,775 at the average prices for the year ending October 31, 1949. The Commission made no finding of fair value or of rate of return as the through-bus routes would operate at an annual loss of $78,481 under the then existing fares, and at a loss of $24,143 annually under the proposed fares.

Our order of August 10, 1950, providing for the issuance of reparation slips for the 3 cent transfer charge to patrons, pending final disposition of the appeals, is terminated.

The order of the Commission is affirmed.