Orlosky, Appellant, *v.* Pennsylvania Public Utility Commission.

410

Argued April 21, 1952. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross, Arnold and Gunther, JJ.

*Samuel R. DiFrancesco,* for appellant.

*Lloyd S. Benjamin,* with him *William J. Grove* and *Jack F. Aschinger,* for appellee.

*Philip N. Shettig* and *Thomas A. Swope,* submitted a brief for intervening appellee.

OPINION BY DITHRICH, J., July 17, 1952:

Ben's Creek Water Company, hereinafter called Water Company, incorporated in Cambria County in 1905, operates a gravity waterworks system supplied from an intake dam located in Ben's Creek. The system includes six miles of cast iron water mains varying in size from three to ten inches. The Water Company serves 241 consumer units, among them dwellings privately owned, dwellings owned by mining companies, two industrial users and two municipalities who purchase for resale.

Prior to 1949 the flat rate for privately owned dwellings was $1.50 per quarter, while the flat rate for mining company dwellings was $3.00 per quarter. Since January 1, 1949, the flat rate has been $2.25 per quarter and $4.00 per quarter for privately owned dwellings and mining company dwellings respectively. On April 15, 1950, the Water Company filed proposed changes in its tariff. A complaint filed by appellant was dismissed by order of the Public Utility Commission dated May 14, 1951.

Rule 12 of the new tariff provides: "The Water Company will install meters to measure the water consumed by any customer who has water piped into his residence or place of business and will thereafter charge for water consumed by said customer at the scheduled meter rates. Any customer, except such customers as obtain water only from an outdoor public hydrant,

may require the Water Company to install a meter to measure the water served to him and thereafter charge for said water at the scheduled meter rates." While the new tariff imposes a minimum quarterly metered service charge of $3.25 for the use of 5,000 gallons or less, the schedule of graduated rates in effect prior to the filing of the new tariff was unchanged. Flat service rates are now available only to dwellings where all water used is obtained from outdoor public hydrants and to other dwellings only until such time as meters are installed.

In this appeal from the order of the Commission, appellant contends (1) that "invocation of Rule 12 in the new tariff regulations ... providing for the installation of meters in unmetered homes ... is unreasonable, burdensome and confiscatory," and (2) that "the installation of meters at the water rates provided in the new tariff will result in ... an increase in revenue to the company ... far beyond a ... fair return on its investment."

The depreciated original cost of the Water Company's property, as found by the Commission, is $31,965, based on an estimated original cost of $56,718. Depreciated reproduction cost was fixed by the Commission at $53,409, based on an estimated reproduction cost of $109,256. The annual reports of the Water Company for the last five years were made part of the record and, according to the Commission, the report for 1950 was the best indicator of future annual operating expenses and income. The operating income for 1950 was $7,031 and operating expenses were $7,765, including $600 for depreciation. It was found that a total increase in operating income of $806 could be anticipated under the new tariff, which when added to $7,031 would result in a future annual operating income of $7,837. Roughly half of the 1950 operating

expenses was paid in salaries to officers of the Water Company who are also officers and employes of the Cambria Mining and Manufacturing Company. The companies being affiliated and under the same control, the salary expense was allocated between them. The Commission, believing that the amount of salary expense allocated to the Water Company was excessive and unreasonable, deducted $2,000 from 1950 operating expenses in arriving at its finding of future annual operating expenses of $5,765. Thus, the anticipated annual return to the Water Company under the new tariff is $2,072, which is 6.5% of depreciated original cost, 3.8% of depreciated reproduction cost, or 4.8% of the average of those costs.

By the Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1437, we are bound by the findings of fact of the Commission if there is evidence to support them. We cannot reverse except for errors of law. *Pittsburgh v. Pennsylvania Public Utility Commission,* 169 Pa. Superior Ct. 400, 82 A. 2d 515; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35; *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 166, 176, 63 A. 2d 466.

We are of opinion that Rule 12 is neither unreasonable nor burdensome, but, to the contrary, is reasonable, equitable and provident. Cf. *Consolidated Ice Co. v. Pittsburgh,* 274 Pa. 558, 562, 118 A. 544.

The Commission found that the Water Company's purpose in eliminating flat rate service is to "conserve its water supply and its distribution capacity, which will defer additions to plant and the added cost thereof; and to more equitably distribute the charges for service." There is ample evidence to support that finding. In the last ten or fifteen years most customers

have had their water supply piped indoors. It is now possible for the Water Company to measure the quantity of water used by a given consumer and to charge accordingly by the expedient of meter installation, whereas in former years the manner in which customers obtained their water—from outdoor hydrants sometimes shared in common—rendered metering impossible and necessitated flat rate service.

It seems unnecessary to observe that meter rates are more equitable than flat rates. Since all consumers do not use the same amount of water, a uniform flat rate unfairly distributes the cost. Metering, on the other hand, distributes the cost to the consumer in proportion to his use of the service and facilities of the Water Company.

Flat rate service is naturally conducive to careless and extravagant use of water. During dry periods of the year water at the dam drops to low levels. Increased consumption by the growing number of domestic users when added to the heavy demands of industrial and municipal users makes enlargment of storage capacity, at great cost, imperative unless wasteful use of water is curbed. Metered service, with charges based on quantity used, will tend to reduce waste, inasmuch as inordinate use will be tempered by consumer self-interest.[1]

---

[1] To point up the inequity of the flat rate charge and the profligate use of water encouraged by it, the Water Company metered and tabulated the quantity of water used by 43 of its domestic customers during three quarters, viz., October 1, 1949, to January 4, 1950; January 4, 1950, to March 28, 1950; March 28, 1950, to June 30, 1950. The tabulations show that during the first quarter 21 used less than 5,000 gallons, 7 used more than 10,000 with 3 of those using over 15,000 gallons. In the second quarter 22 used less than 5,000 gallons, 5 used more than 10,000 with 2 of those using over 15,000 gallons. In the third quarter 23 used less than

"In order to function in the public interest, the rates of a utility must be such as to cover legitimate operating expenses, and at the same time not result in an excessive return upon the fair value of the property devoted to the public use": *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35.

The Commission stated that "the annual return of $2,072 to be anticipated under the new tariff would not be an excessive return on any finding of fair value that would be justified by the evidence in this proceeding; and that the revenue to be realized . . . under the new tariff will not be unreasonable or excessive." We agree.

In fixing the fair value of a utility in a rate-making case "the commission is not bound by any formula, but shall consider all elements of value and all facts which have a relevant bearing on fair value. Reproduction cost, original cost, and all other elements affecting value are to be given their proper weight in the final conclusion": *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 464, 465, 51 A. 2d 497.

Appellant points out that the Water Company's figures relating to fair value, which the Commission accepted subject to minor adjustments, did not reflect the 5% annual depreciation rate appearing on the Water Company's books from 1915 to 1930 and the 2½% rate appearing on its books from 1930 to 1947. In this he is correct. However, the Commission expressly rejected "booked depreciation" as being "entirely inconsistent" with the depreciation on the other fixed capital.

---

5,000 gallons, 11 used more than 10,000 with 2 using over 15,000 gallons. One person used 19,750 gallons in a single quarter.

Recent cases have made it plain that accrued depreciation,[2] for purposes of rate making, must of necessity be a judgment figure. *Blue Mountain T. & T. Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 326, 67 A. 2d 441; *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 393, 402, 68 A. 2d 448; *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 526, 69 A. 2d 844. It appears that the depreciation reserve set up on a utility's books is not binding on the Commission in any way. In the *Blue Mountain* case, supra, ARNOLD, J., said (pp. 326, 327) : "The only other evidence of the accrued depreciation was the reserve set up on appellant's books, which was accumulated by the application of percentage to the book cost of the plant, and which was based on the average life of the several elements thereof. The Commission pointed out that the opinion evidence showed the so-called 'observed depreciation' to be 27.9%, and that the book reserve for depreciation was 42.5%. The Commission, after carefully considering all of the evidence, found that the accrued depreciation was 38%,—which obviously had to be a judgment figure. . . . When the Telephone Company set up a book reserve for depreciation it was advantageous to it to make the percentages for depreciation as high as possible, and thus to justify the then existing rates and the then fair return to the utility. The accrued depreciation set up amounted to 42.5%. Likewise it was to the benefit of the Telephone Company, on the applica-

---

[2] "A proper 'depreciation study' to measure the actual depreciation must take into consideration the loss in value to the extent that physical deterioration actually occurs, together with obsolescence, inadequacy and any requirements of public authority": *Blue Mountain T. & T. Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 324, 67 A. 2d 441.

tion for increased rates, to place the percentage depreciation as low as possible, thus increasing the value of the property so that the owner might obtain a greater return." Cf. *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 491, 34 A. 2d 375.

It is believed that the Commission properly rejected "booked depreciation" on the ground of inconsistency, since acceptance of book rates would result in an accrued depreciation in excess of 100%, plainly inconsistent with actualities.

Appellant questions the consideration given an $18,-551.27 item[3]—carried on the Water Company's books as representative of an assignment of assets received from the Cambria Mining and Manufacturing Company—as part of the "actual investment" made in the Water Company. It is argued that the item represents an illusory transfer because of the close relationship existing between the two companies. But the record discloses that the item legitimately represents property transferred to the Water Company in exchange for stock and, therefore, was properly considered in fixing the rate base. Prior to the organization of the Water Company, the Cambria Mining and Manufacturing Company had acquired plant and facilities to utilize the water in Ben's Creek. The plant and facilities were assigned to the Water Company at the time of its organization, but the cost or value of the property was not set up on the Water Company's books until 1948. The Water Company's engineer estimated the original cost of the assigned property as of the date of its installation or acquisition by the Mining Com-

---

[3] The Commission states that "$18,551.27 of fixed capital installed by the mining company between 1873 and 1905 and turned over to the water company, was not booked until 1948 without any depreciation."

pany and added that amount to the cost of property installed by the Water Company after 1905.

While appellant admits that the Water Company's estimate of reproduction cost, accepted by the Commission, may be correct, he argues that reproduction cost must be studied in light of the fact that the necessity of complete reproduction of the plant as a result of physical deterioration, obsolescence, or major disaster, is improbable. The argument is without merit.

Appellant asserts that the fair value of the Water Company's property is $30,730, but the only evidence to support that figure is the bare statement of appellant's engineer that "The actual historical depreciated to date value of the ... Company ... is just approximately $30,730.00." The Commission accorded no probative weight to that unexplained and unsupported statement and manifestly it was worthy of none.

The new tariff will effect an increase in revenue corresponding to increased charges for service to 93 privately owned dwellings and 72 mining company dwellings. No other consumers will be affected, either because they have been paying at metered rates and already pay in excess of the new minimum quarterly charge, or because they are not metered and will pay at the flat rate as heretofore. The Commission found, based on supporting data filed by the Water Company, that metered service rates under the new tariff will result in an average quarterly bill of $4.25—as compared with former flat rate bills of $2.25 and $4.00 per quarter—which will produce a total increase in revenue of $806 and will create a future annual operating income of $7,837. In so finding the Commission rejected appellant's estimate of future annual operating income totaling $10,647.52 as being the product of erroneous calculations. The divergence in estimates is due in part to appellant's misinterpretation of the data sub-

mitted by the Water Company, referred to in footnote 1, and in part to the Commission's use of the operating income as shown in the 1950 annual return in its computations. Appellant failed to take into account the fact that the Water Company's tabulations—intended to demonstrate waste and inequality of consumption by domestic users—were derived from meter readings at only 43 consumer units at a time when consumers were charged at flat rates, and, therefore, cannot be taken as a literal forecast of what amounts domestic consumers will use when paying at metered rates. Moreover, appellant miscalculated the number of consumers who would be affected by the change to metered rates. The Commission's choice of 1950 operating income, as indicative of future operating income aside from the increase attributable to the new tariff, was, of course, within its discretion. It must be borne in mind that the Commission must necessarily have the power to exercise its own judgment in forecasting probable future revenue. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35.

The difference of $176.26 between the Commission's finding of the amount of future annual operating expenses and appellant's estimate is without significance.

At the hearing the examiner refused to admit evidence of water rates prevailing in several neighboring communities. Appellant contends that such evidence is admissible under the decision of this Court in *Pennsylvania Power & Light Co. v. Public Service Commission,* 128 Pa. Superior Ct. 195, 193 A. 427. In that case it was said (pp. 219, 220): "Comparative rates are certainly not conclusive and sometimes are only of slight probative value, but here the evidence was not only admissible and proper for consideration together with other facts in the case, but should have much

420

probative weight in view of the large discrepancy and the extent of the field covered by the facts produced." However, the admissibility of comparative rates was favored only because the utilities whose rates were the subject of comparison operated under similar conditions and because there were sufficient facts in the record to warrant a comparison, the Court referring principally to other evidence tending to show that the utility whose rates were to be determined may have made "considerable investments that were improvident."

In this case the similarity of conditions does not appear. Moreover, there is no evidence of improvident investment, nor any other evidence in the record which would justify a comparison of rates. In any event the evidence offered would be of slight probative weight, even if admissible, because a large discrepancy is not indicated and the extent of the field covered is much more limited in area than in the case relied on by appellant.

Order affirmed.