# South Pittsburgh Water Co.
# v. Penna. Public Utility Commission

*Robert H. Young, Ernest V. von Starck, W. James Mac-Intosh,* of Morgan, Lewis & Bockius, Philadelphia; *George H. Hafer, Robert L. Rubendall,* of Hull, Leiby and Metzger, for plaintiff.

W. Russell Hoerer, Jack F. Aschinger, Asst. Counsel; Thomas M. Kerrigan, Acting Counsel, for P. U. C., deft.

NEELY, J., March 25, 1955.—In this proceeding in equity plaintiff is a public utility corporation organized and existing under the laws of this Commonwealth. Original defendant is the Pennsylvania Public Utility Commission, hereinafter called the commission.

Plaintiff in its prayer for equitable relief asks that defendant be restrained from requiring plaintiff to continue in effect beyond March 31, 1955, a contract rate contained in a certain tariff no. 11 of plaintiff involved in a rate case before the commission "unless and until the defendant, after notice and hearing, should prescribe the (contract) rate . . . as a temporary rate, pending final determination of the rate proceeding, as authorized by section 310(a) of the Public Utility Law".

The City of Pittsburgh, hereinafter called Pittsburgh, was allowed to intervene as a party defendant and has filed an answer in which it takes the same position as original defendant. The matter is before us on plaintiff's complaint and the answers of defendant and intervening defendant.

A hearing was held on March 4, 1955, before the chancellor on the issues raised in the pleadings, and on the same day, in the interest of expediting this case, argument was held by the court en banc on plaintiff's requests for conclusions of law. Both defendants waived their right to file such requests. However, they argued their legal position in the matter, contra the requests submitted by plaintiff.

The complaint sets forth that plaintiff supplies water to the public in a portion of the City of Pittsburgh, also to boroughs and territories adjacent thereto in certain townships, all in Allegheny County. It is averred that by virtue of an agreement dated October 3, 1918, approved by the Public Service Commission

on January 6, 1919, plaintiff agreed to sell to Pittsburgh "all water used by Pittsburgh's residents connected to the plaintiff's distribution facilities and Pittsburgh agreed to pay the plaintiff on the basis of the total of the amounts chargeable to each of the said customers under the plaintiff's regular schedule of rates, less a five per cent discount for payment within 30 days."

It is averred that subsequent contracts were made between plaintiff and Pittsburgh relating to rates and that a certain city contract dated July 16, 1941, effective April 1, 1941, was made concerning rates to consumers "which contained an involved formula for determining the amount to be paid by Pittsburgh". This city contract, it is alleged, expired March 31, 1951, and was thereafter renewed from year to year until Pittsburgh was served by plaintiff on November 29, 1954, with a notice that the city contract would terminate on March 31, 1955, there being a clause in the city contract permitting either party to terminate upon 90 days' notice.

Plaintiff avers that on November 29, 1954, plaintiff filed with the commission supplement no. 6 to its Tariff Water-Pa. P. U. C. No. 11 to become effective February 1, 1955, stating new rates, and on December 28, 1954, Pittsburgh filed with the commission a complaint and petition to suspend the proposed rates in this supplement.

Plaintiff's complaint sets forth that the city contract is filed as part of plaintiff's tariff of rates "and it is now set forth under the heading 'Rate to the City of Pittsburgh' in plaintiff's currently effective Tariff Water-Pa. P. U. C. No. 11."

Plaintiff avers that effective March 31, 1955, upon termination of the city contract, residents of Pittsburgh receiving water through plaintiff's facilities would become regular customers at the regular meter

rates, unless, however, the city would at this point purchase from plaintiff the water requirements of those residents at discounts totaling 4 per cent, in accordance with a proposed contract contained in supplement no. 6 of tariff no. 11.

It is alleged in the complaint that the commission on its own motion on January 24, 1955, ordered an investigation of the rate proposed in supplement no. 6, and on the same day ordered the suspension of that supplement for a period of six months from February 1, 1955, to August 1, 1955, and further ordered that plaintiff continue in effect the rate set forth in the city contract under date of July 16, 1941, contained in tariff no. 11.

Plaintiff in its complaint does not challenge the authority of the commission to suspend the rate stated in supplement no. 6, but does aver that the commission had no authority to order plaintiff to maintain in effect for six months the rate prescribed under the city contract and set forth in tariff no. 11. Plaintiff contends that the commission's order of January 24th continuing for the six months' period the contract rate set forth in the city contract is unlawful and beyond the jurisdiction of the commission. Because plaintiff contends the order of January 24th was invalid, the jurisdiction of this court has been invoked under section 1111 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1441, to restrain the commission from enforcing its order of January 24th with respect to the continuance of the city contract rate.

Defendants in their answers do not substantially controvert any of the facts pleaded in the complaint. They do, however, take issue with certain of the legal conclusions set forth in the complaint, and in contradiction of plaintiff's position maintain that the commission acted according to law and in accordance with the powers conferred upon it under the provisions of the Public Utility Law.

We have adopted the stipulation of fact as made by the parties and in accordance with that stipulation make the following

## Findings of Fact

1. South Pittsburgh Water Company is a public utility corporation organized and existing under the laws of the Commonwealth of Pennsylvania for the supply of water to the public in the twenty-ninth, thirtieth, thirty-first, and thirty-second wards and portions of the sixteenth, eighteenth, nineteenth, twentieth, and twenty-eighth wards in the City of Pittsburgh; the Boroughs of Baldwin, Bethel, Brentwood, Bridgeville, Carnegie, Castle Shannon, Crafton, Dormont, Greentree, Heidelberg, Ingram, Mt. Oliver, Munhall, Pleasant Hills, Rosslyn Farms, Thornburn, West Homestead, West Mifflin, Whitaker, Whitehall, and part of Dravosburg; the Townships of Collier, Jefferson, Mt. Lebanon, Robinson, Scott, Snowden, South Fayette, and Upper St. Clair, and other territory adjacent to the above municipalities, all in Allegheny County, Pa.

2. Defendant is the Pennsylvania Public Utility Commission organized and created under the Act of March 31, 1937, P. L. 160, having as its principal function the administration of the Public Utility Law of May 28, 1937, P. L. 1053, as amended.

3. The wards in the City of Pittsburgh (hereinafter called Pittsburgh) which are within plaintiff's charter territory were a part of the charter territory of plaintiff or its predecessors prior to the annexation of those areas by Pittsburgh and have always been served through facilities owned, operated, and maintained by plaintiff.

4. On October 3, 1918, plaintiff and Pittsburgh entered into an agreement under which plaintiff agreed to sell to Pittsburgh all water used by Pittsburgh's residents connected to plaintiff's distribution facilities

and Pittsburgh agreed to pay plaintiff on the basis of the total of the amounts chargeable to each of the customers under plaintiff's regular schedule of rates, less a 5 per cent discount for payment within 30 days. This agreement was approved by the Public Service Commission on January 6, 1919.

5. Subsequent agreements substantially in the same form as that referred to in paragraph 4, each for fixed periods of years, were entered into by Pittsburgh and plaintiff and were approved by the Public Service Commission or defendant until July 16, 1941, on which date plaintiff and Pittsburgh entered into a new written agreement (hereinafter called the city contract) which also provided for the sale to Pittsburgh of all water used by its residents connected to plaintiff's distribution system, but which contained an involved formula for determining the amount to be paid by Pittsburgh.

6. The city contract was originally filed with defendant as a part of plaintiff's Tariff Water-Pa. P. U. C. No. 7 to be effective April 1, 1941, upon less than statutory notice in accordance with special permission no. 20351 issued by defendant on September 12, 1941, and it is now set forth under the heading "Rate to the City of Pittsburgh" in plaintiff's currently effective Tariff Water-Pa. P. U. C. No. 11, which tariff is attached to plaintiff's complaint as exhibit A. Plaintiff began charging Pittsburgh for water sold to it and supplied to its residents in accordance with the rate contained in the city contract effective April 1, 1941, and was still doing so on November 29, 1954.

7. Section 7 of the city contract provides in part as follows:

"*SECTION 7. EFFECTIVE DATE OF AGREEMENT AND TERM AND TERMINATION OF PRIOR CONTRACT BETWEEN THE PARTIES.* This agreement shall become effective as of April 1,

1941, subject to the approval or acceptance thereof by the Pennsylvania Public Utility Commission, and shall terminate March 31, 1951, subject, however, to the right of either party hereto to terminate this agreement at the end of any calendar quarter prior to March 31, 1951, upon not less than ninety (90) days' notice in writing served upon the other party hereto, fixing the date of such termination.

"It is further understood and agreed that after March 31, 1951, this agreement may be continued in force for another year, and so on from year to year unless terminated sooner in the manner hereinbefore provided."

8. In accordance with the aforesaid provisions of section 7 of the City Contract, plaintiff, on November 29, 1954, mailed to David L. Lawrence, Mayor of City of Pittsburgh, a letter dated November 29, 1954, notifying City of Pittsburgh that the city contract would terminate on March 31, 1955. The letter of November 29, 1954, was received by David L. Lawrence, Mayor of City of Pittsburgh, on November 30, 1954. A copy of said written letter of notice is attached to plaintiff's complaint as exhibit B.

9. Plaintiff's regular meter rates, as contained in Tariff Water-Pa. P. U. C. No. 11, exhibit A to plaintiff's complaint, specifically provide that they are "not applicable in the City of Pittsburgh as long as contract of July 16, 1941, is in effect." Therefore, in accordance with tariff no. 11, the residents of Pittsburgh receiving water through plaintiff's facilities would become regular customers of plaintiff at its tariff rates at March 31, 1955, the date when the city contract would terminate, in the absence of legally authorized action by defendant to prevent that result.

10. On November 29, 1954, plaintiff filed with defendant supplement no. 6 to its Tariff Water-Pa. P. U. C. No. 11, to become effective February 1, 1955,

which supplement provides that any municipality qualifying thereunder may at its option purchase from plainitff the water requirements of its residents connected to plaintiff's facilities at a price equal to the total of all the charges to the residents, less discounts totaling 4 per cent. Supplement no. 6 to Tariff Water-Pa. P. U. C. No. 11, filed November 29, 1954, was on that date a new tariff stating a new rate. A copy of the supplement is attached to plaintiff's complaint as exhibit C. The supplement was filed by plaintiff in order to afford Pittsburgh a means whereby it could purchase and pay for the water consumed by its residents after March 31, 1955, if it desired to do so, and if the supplement were to become effective and Pittsburgh were to accept the option of purchasing water thereunder, plaintiff would charge Pittsburgh in accordance with the terms of the supplement.

11. At the time of filing the supplement no. 6 plaintiff advised defendant that it was giving notice to Pittsburgh that the city contract would terminate on March 31, 1955, and at the same time plaintiff supplied defendant with data and information disclosing the return which plaintiff would earn upon termination of the city contract estimated both on the assumption that Pittsburgh would take service under supplement no. 6 and the assumption that residents of Pittsburgh would be billed directly under the regular tariff rates. Specifically, the information supplied defendant shows that the gross operating revenues per books collected by plaintiff from Pittsburgh during the year ended September 30, 1954, were $968,675.08 and that after annualizing the revenue from customers added during the year ended September 30, 1954, the total annual operating revenues anticipated by plaintiff from Pittsburgh on the basis of facts existing at September 30, 1954, amounted to (a) $951,605.26, if the city contract remained in force, (b) $1,127,336.58, if

supplement no. 6 were in effect, and (c) $1,154,776.77 if plaintiff billed its customers within Pittsburgh at the regular meter rates contained in Tariff Water-Pa. P. U. C. No. 11.

12. On December 28, 1954, Pittsburgh filed with defendant a complaint and petition to suspend proposed rates requesting not only that defendant investigate the lawfulness of supplement no. 6 and suspend its operation pending completion of that investigation, but also that it "continue in effect the existing charges to the city by contract."

13. On January 7, 1955, plaintiff filed an answer to the Pittsburgh complaint coupled with a motion to dismiss so much of the complaint as sought to have defendant continue in effect the existing charges to the city by contract.

14. On January 24, 1955, in executive session defendant denied plaintiff's motion to dismiss.

15. On January 24, 1955, at complaint docket no. 16266, defendant issued its order of "investigation upon commission motion", and on January 24, 1955, it issued its "suspension order" at the same docket number, which suspension order suspends the operation of supplement no. 6 from February 1, 1955, to August 1, 1955, and provides further that "3. The respondent forthwith file a supplement suspending supplement no. 6 to Tariff Water-Pa. P. U. C. No. 11 and continuing in effect the rate in force in a contract entered into on July 16, 1941 between South Pittsburgh Water Company and the City of Pittsburgh and contained in Tariff Water-Pa. P. U. C. No. 11."

Defendant has filed a copy of the suspension order with supplement no. 6 in the tariff section of defendant's bureau of rates and research. Copies of these orders are attached to plaintiff's complaint as exhibits D and E, respectively.

16. By letter dated January 28, 1955, the secretary of defendant advised plaintiff that supplement no. 6 had been suspended under authority of section 308(b) of the Public Utility Law, supra, and forwarded to plaintiff a form of supplement to its tariff to be filed in compliance with the suspension order, exhibit E to plaintiff's complaint, which form of supplement includes the following language: "The rates named in the contract entered into July 16, 1941, as contained in Tariff Water-Pa. P. U. C. No. 11, will continue to apply until otherwise amended." A copy of the letter of January 28, 1955, and the suggested supplement no. 7 are attached to plaintiff's complaint as exhibit F.

17. The suspension order, exhibit E to plaintiff's complaint, and the form of supplement no. 7 proposed by defendant, exhibit F to plaintiff's complaint, will have the effect of making the rate set forth in the city contract effective after March 31, 1955, the date on which the city contract would otherwise terminate in accordance with the terms of the notice heretofore given by plaintiff to Pittsburgh, exhibit B to plaintiff's complaint.

18. The charges to Pittsburgh under the city contract currently amount to approximately $203,000 per year less for the water taken by consumers in Pittsburgh than plaintiff would receive if it billed those consumers directly at its regular tariff rates.

### Discussion

By virtue of the provisions of section 1111 of the Public Utility Law, it is ". . . the duty, of the Dauphin County Court, to entertain a bill to enjoin the Commission from acting in this case or in any other in which the powers and authority of the Commission to act are called in question": York Railways Company v. Driscoll et al., 331 Pa. 193, 196 (1938). See also Bell Telephone Company of Pennsylvania v. Driscoll

et al., 343 Pa. 109, 112 (1941); Philadelphia Electric Company v. Public Service Commission et al., 314 Pa. 207 (1934); Citizens Passenger Railway Co. v. Public Service Commission et al., 271 Pa. 39 (1921); Beaver Valley Water Company v. Driscoll et al., 51 Dauph. 105, 114 (1941). The question before us then in this case is simply whether the order of January 24, 1955, must be considered as being invalid because it was beyond the authority of the commission to enter that order.

Plaintiff concedes that supplement no. 6 (dated November 29, 1954) to its tariff no. 11 states a new rate effective February 1, 1955, and does not challenge that portion of the commission's order of January 24th suspending the new rate stated in this supplement "from February 1, 1955 to August 1, 1955, a period of six months." For an analysis of the commission's discretionary power of suspension as an administrative function, see Philadelphia v. Pennsylvania Public Utility Commission et al., 164 Pa. Superior Ct. 96, 103, 104 (1949).

The following portion of the commission's order of January 24th, however, is challenged as being invalid, to wit:

"That respondent forthwith file a supplement . . . continuing in effect the rate in force in a contract entered into on July 16, 1941, between South Pittsburgh Water Company and the City of Pittsburgh, and contained in Tariff Water Pa. P. U. C. No. 11."

Plaintiff maintains that this portion of the order is invalid because it constitutes either "(i) a suspension of plaintiff's action in terminating the City Contract as of March 31, 1955, or (ii) the imposition of a new or temporary rate without notice and hearing, both of which alternatives are unlawful and beyond defendant's jurisdiction and authority" (paragraph 20 of complaint). Plaintiff claims that the entry of

this order was beyond the jurisdiction of the commission, and for that reason invokes section 1111 of the Public Utility Law in this court.

It will be an aid to a clear understanding of the position of these parties to have us consider at this point the provisions of the Public Utility Law that are cited by them in support of their contentions. The commission in support of its order of January 24th invokes the provisions of section 308(*b*) (66 PS §1148) of the Public Utility Law, which reads as follows:

"(b) Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission, upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before it becomes effective, suspend the operation for such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. *The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension,* unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act. The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility." (Italics supplied.)

The commission contends that it was authorized by section 308(*b*) to issue its order of January 24th suspending for six months the supplement dated November 29, 1954, which stated a new rate effective February 1, 1955, and further that the commission was authorized to continue in force during the period of

suspension the rates stated in the city contract contained in tariff no. 11. Actually, the commission contends that the express language of section 308(b) directs such continuance for the period of suspension.

Plaintiff, on the other hand, cites section 310(a) of the Public Utility Law, 66 PS §1150, which provides:

"(a) The commission may, in any proceeding involving the rates of a public utility brought either upon its own motion or upon complaint, after reasonable notice and hearing, . . . fix, determine, and prescribe temporary rates. . . ."

Plaintiff contends that the commission by its order of January 24th improperly interfered with the termination of the city contract of July 16, 1941, because plaintiff had the option to terminate that contract by unilateral action on 90 days' notice under section 7 of the contract, original page 14, of tariff no. 11, and plaintiff contends that the effect of the commission's interference with the termination of the city contract was illegally to fix, determine and prescribe a temporary rate without any hearing or notice, contrary to section 310(a).

Plaintiff points out also that a rate can only be fixed under section 309 of the Public Utility Law (66 PS §1149), or section 308(c) of that statute "after reasonable notice and hearing". And plaintiff argues that the commission in extending the city contract beyond March 31, 1955, reformed or revised that contract without a hearing, contrary to the provisions of section 920 (66 PS §1360) of the Public Utility Law.

We must determine in this case whether the charge for water service to the City of Pittsburgh as based on the contract of July 16, 1941, (1) can be continued as a rate under section 308(b) of the Public Utility Law during the period of suspension, or (2) must be established as a temporary rate under section 310(a) of that law. In the former event (1), there can be no specific monetary recoupment by plaintiff from con-

sumers if higher permanent rates than the city contract charge are ultimately allowed as a result of the commission's investigation. But in the latter event (2), plaintiff could recover by means of temporary increases charged the consumer (section 310(e)) the difference between the temporary rate charged and any higher prescribed permanent rates.

The last sentence of section 308(b) is pertinent as to what effect the court must give to the suspension of rates in determining any increase in rates. This sentence reads as follows:

"The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility." See City of Pittsburgh v. Pennsylvania Public Utility Commission, 171 Pa. Superior Ct. 187, 217 (1952); Equitable Gas Company v. Pennsylvania Public Utility Commission, 174 Pa. Superior Ct. 450, 457 (1954). These cases hold that the commission is not required to make a specific additional monetary allowance for the effect of suspension, but can consider the over-all effect of any increase in rates ultimately allowed by the commission in its final order in relation to the suspension.

Basically, plaintiff's position is that the commission by its order of January 24th was interfering with plaintiff's contract with Pittsburgh, and by virtue of such interference plaintiff's action imposed a temporary rate without a hearing. The position of the commission and Pittsburgh, on the other hand, is that the city contract stated a rate and the commission had power in suspending the proposed new rates under supplement no. 6 to continue in force the contract rate pending its investigation for a period of six months.

The question then is whether the order of the commission can be considered merely as affecting the contract of July 16, 1941, which plaintiff claims it was

free to terminate, or whether that order operates to maintain in force a previously existing rate to the City of Pittsburgh. If the agreement of July 16, 1941, was merely a contract, then plaintiff's position would be well taken. But if this agreement was not only a contract but also amounted to a statement of a contract rate as published in tariff no. 11, and if that rate was in force when supplement no. 6 was filed on November 29, 1954, it would seem to us that all of the provisions of section 308 of the Public Utility Law relating to voluntary changes in rates would apply.

In determining whether or not this city contract did state a rate, it is important to bear in mind how all the parties have construed that contract. The contract is set forth in plaintiff's tariff no. 11 as part of the rate schedule. The tariff states metered rates to consumers in the area, and then on original page 7 of tariff no. 11 is contained this language:

*"Rate to the City of Pittsburgh*

"The rate to be charged the City of Pittsburgh for water and other services furnished it shall be as set forth in contract dated July 16, 1941 between the South Pittsburgh Water Company and the City of Pittsburgh, copy of which contract is as follows: . . ."

Thereafter, there is set forth in the tariff the exact language of the contract of July 16, 1941, prescribing the basis on which rates are to be charged for water sold to Pittsburgh and billed to those residents who are consumers.

And according to the stipulation of fact, the same "City Contract was originally filed with the defendant as a part of plaintiff's Tariff Water-Pa. P. U. C. No. 7 to be effective April 1, 1941 upon less than statutory notice in accordance with Special Permission No. 20351 issued by defendant on September 12, 1941, . . ." It thus appears that for approximately 14 years this city

contract was considered by the parties as stating an established contract rate in plaintiff's tariff.

Section 2(19) (66 PS §1102-19) defines "rate" as follows:

" 'Rate' means every individual, or joint fare, toll, charge, rental, or other compensation whatsoever of any public utility, . . . and any rules, regulations, practices, classifications or contracts affecting any such compensation, charge, fare, toll, or rental."

In construing the meaning of the term "rate" under this section, the Superior Court in Penn-Harris Hotel Company v. Pennsylvania Public Utility Commission, 166 Pa. Superior Ct. 394, 399 (1950) said:

"This broad and comprehensive definition embraces substantially any and all compensation received by a public utility for services rendered to a consumer."

And it seems to us that this contract of July 16, 1941, has been construed as stating a rate by the commission (complaint docket no. 15578), and by the Superior Court in Pittsburgh v. Pennsylvania Public Utility Commission, 174 Pa. Superior Ct. 363 (1954), in a rate proceeding growing out of plaintiff's tariff no. 11 that is now before us in this case. The Superior Court said at page 372:

". . . The Commission in commenting on these charges regarded them merely as a part of 'a formula for determining a reasonable charge for the service' . . ."

The component parts of the "formula" under the city contract for determining the total amount charged the City of Pittsburgh for water may be summarized as follows:

1. A return of 6 per cent on an adjusted rate base consisting of the estimated reproduction cost (prices at July 1, 1938) of the distribution facilities in existence at December 31, 1940, plus net additions thereto, and minus accrued depreciation at an annual rate of 0.8 per cent. This rate base refers to distribution facili-

ties used to furnish water to residents of City of Pittsburgh.

2. Annual operating and maintenance expenses of South Pittsburgh Water Company related to distribution facilities located within the City of Pittsburgh.

3. An annual charge for unaccounted for water.

4. An annual allowance for depreciation of distribution facilities located within the City of Pittsburgh at the annual rate of 0.8 per cent.

5. A unit charge for each public fire hydrant.

6. Annual cost of preparing statements showing water consumption by residents of City of Pittsburgh receiving water from South Pittsburgh Water Company's facilities.

7. A charge for water sales to City of Pittsburgh, based on the total of all meter readings of all residents of the city receiving water from South Pittsburgh Water Company's facilities and on application of South Pittsburgh Water Company's general tariff rate to that total consumption as if all water were taken by one customer, City of Pittsburgh.

The Superior Court in Pittsburgh v. Pennsylvania Public Utility Commission, supra, at page 371, comments on this city contract as follows:

"The distribution system within the nine wards of the City of Pittsburgh was installed by the Company and was owned by it. The Commission properly included the value of this property in the rate base notwithstanding payments by the City to the Company under the terms of a contract entered into by them in 1941 which had the approval of the Commission. Under the contract the Company sold water to the City at wholesale for resale by it to approximately 24,500 consumers within the area served by the Company's distribution system. In substance the contract provided for the reading of the meters of the consumers within the City by the Company's meter readers;

*the City was charged with the total of all meter read-
ings and paid for the water consumed at the Com-
pany's current rates as though for consumption by a
single customer."* (Italics supplied.)

Plaintiff argues, however, that if we construe the
city contract incorporated in tariff no. 11 as fixing
a rate, we must also give effect to the provisions of
the contract which grant to either party the option to
terminate the agreement on 90 days' notice. If tariff
no. 11 states a rate, and we believe it does, then this
provision as to optional unilateral termination must
be read in connection with the applicable provisions
of the Public Utility Law with respect to a change of
rates.

Section 308(*a*) of the Public Utility Law relates to
voluntary changes of rates and provides:

"Unless the commission otherwise orders, no public
utility shall make any change in any existing and duly
established rate, except after sixty days' notice to the
commission, which notice shall plainly state the
changes proposed to be made in the rates then in force,
and the time when the changed rates will go into
effect."

The parties, in our judgment, even with the optional
provisions to terminate the agreement, could not affect
the jurisdiction of the commission to consider these
voluntary changes under section 308 of the Public
Utility Law.

Such optional termination, so far as it relates to
rates, would be subject to the provisions of section
308(*b*) of the Public Utility Law, which authorizes
the commission to suspend the new rate stated in sup-
plement no. 6 and continue in force the contract rate
during the period of suspension. The commission could
do this because it has the power to continue the rate
in force during that period. The parties, of course,
could not change the powers imposed upon the com-

mission by law, and that it was not their intent to do so is shown by the following language of the city contract set forth on original page 15 of tariff no. 11, wherein it is stated:

"It is hereby understood and agreed that neither the purpose nor the intent nor the obligation of this agreement, when approved or accepted by the Pennsylvania Public Utility Commission, is such as to impair or in anywise affect the exercise by said Commission of any of the powers vested in it by the Public Utility Law."

It is our view that the city contract as incorporated in tariff no. 11 states a rate to the City of Pittsburgh and that this rate has actually been incorporated into plaintiff's rate structure since the effective date of tariff no. 11 on April 1, 1941. This contract rate was in force when supplement no. 6 was filed on November 29, 1954. We, therefore, believe that in accordance with the authority contained in section 308($b$) of the Public Utility Law, the commission had the power, and was indeed required in connection with the suspension of supplement no. 6 to direct the continuance of the contract rate during the suspension period.

Tariff no. 11 provides that the company's regular meter rates and other water charges are "not applicable in the City of Pittsburgh as long as contract of July 16, 1941 is in effect." According to plaintiff's contention, this quoted statement constitutes an alternate rate for the City of Pittsburgh. Plaintiff argues that in terminating the city contract after March 31, 1955, it has merely exercised the option set forth in the city contract to discontinue treating Pittsburgh as a customer, and has continued to treat the ultimate consumers as customers at the duly established meter rates. It is contended by plaintiff that the contract rate can remain the "rate in force" within the meaning of the provisions of section 308($b$) of the Public Utility Law

only until March 31, 1955, on which date the contract terminated by virtue of the option exercised by plaintiff. After March 31, 1955, according to plaintiff, the "rate in force" would become the regular meter rates established in its existing tariff no. 11. Hence, plaintiff contends that the contract rate cannot be maintained as the "rate in force" under section 308(*b*).

Tariff no. 11 does not in express terms state an alternate rate, and if we are to conclude that the existing tariff does by implication contain such an alternate rate, such conclusion in our judgment does not support plaintiff's contention that after March 31, 1955, the "rate in force" would be the regular meter rates. The rate which must be continued under the clear provisions of section 308(*b*) of the Public Utility Law, when the commission suspended the proposed new rate, is the "rate in force" on the date the new rate was filed. The language "rate in force," as used in this section, in our judgment means the rate being charged on the date the new rate was filed. The date the new rate was filed was November 29, 1954, when supplement no. 6 was filed, and the "rate in force" was the contract rate in effect under the city contract on that date. Therefore, even though we were to accept plaintiff's contention that it is an alternate rate, the public Utility Law plainly requires that the "rate in force" on November 29, 1954, must be continued in this case during the period of suspension.

In view of the foregoing, we state the following

### Conclusions of Law

1. The city contract of July 16, 1941, incorporated into plaintiff's tariff no. 11 as a "rate to the City of Pittsburgh," states a rate. This rate was in force on November 29, 1954.

2. In filing with the Pennsylvania Public Utility Commission on November 29, 1954, supplement no. 6 to its Tariff Water-Pa. P. U. C. No. 11, plaintiff pro-

posed to make a voluntary change in this rate effective February 1, 1955, and did state a proposed new rate affecting the City of Pittsburgh.

3. The Pennsylvania Public Utility Commission, under authority granted in section 308(b) of the Public Utility Law of May 28, 1937, P. L. 1053, was authorized by its order dated January 24, 1955, to suspend the operation of the new rate stated in supplement no. 6 for a period of six months, to wit, from February 1, 1955, to August 1, 1955, and the commission's order of suspension on that date was lawful.

4. The Pennsylvania Public Utility Commission, in accordance with the provisions of section 308(b), also had authority by its order dated January 24, 1955, to direct that the rate in force to the City of Pittsburgh on November 29, 1954, when supplement no. 6 was filed, should be continued during the period of suspension. The rate in force to the City of Pittsburgh when supplement no. 6 was filed was the contract rate stated in the city contract of July 16, 1941, and accordingly the Pennsylvania Public Utility Commission had authority to continue that rate in force during the period of suspension.

5. The commission was authorized to enter its order of January 24, 1955, without notice and hearing under the provisions of section 308(b) of the Public Utility Law.

### Decree Nisi

And now, March 25, 1955, it is ordered, adjudged and decreed that plaintiff's complaint be and the same hereby is dismissed. The prothonotary is directed to enter this decree nisi and notify the parties to this proceeding or their counsel forthwith. If no exceptions are filed within 20 days after notice of the filing of this adjudication, this decree nisi shall be entered as of course by the prothonotary as the final decree. The cost of this proceeding shall be paid by plaintiff.