Duquesne Light Company, Appellant, v.
Pennsylvana Public Utility Commission.

Argued October 11, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Charles K. Robinson,* with him *Philip A. Fleger,* for Duquesne Light Company, appellant.

*Lloyd S. Benjamin,* with him *Thomas M. Kerrigan* and *Charles E. Thomas,* for Public Utility Company, appellee.

*Anne X. Alpern,* City Solicitor, and *Leo I. Shapiro,* Assistant City Solicitor, for City of Pittsburgh, intervening appellee.

OPINION BY HIRT, J., January 14, 1949:

For many years Duquesne Light Company (which we will refer to as the Company) has furnished a complete street lighting service to the City of Pittsburgh under rate S of its established tariff applicable to such municipal service. The rate is a composite or "package" rate which combines the furnishing and the lighting of lamps throughout the City with nightly inspection and replacement, at unit charges. Specific additional monthly charges, by way of rental or otherwise, were made by the Company for various types of fixtures, brackets, poles, underground supply lines and overhead extensions, essential to the utilization of the energy made available over 227 separate circuits at 17 substations in the City. The lighting system was separate and independent of the Company's general distribution system. Looking toward reductions in the cost of street lighting in Pittsburgh the Council and the Mayor of the City directed detailed plans and specifications to be prepared, pursuant to an enabling ordinance, for an entirely new and modern lighting system eventually to become the property of the City. Accordingly, the City, under its municipal powers, advertised for bids on three separate ten-year contracts, as follows: "Contract No. 1—For the supply of suitable electric current to energize the new street lighting system, comprising approximately

20,000 street lights which will consume about 1,500,000 KWH of electric energy per month. Contract No. 2— For the installation and sale to the City of such new street lighting system, including fixtures, brackets, ornamental poles and other equipment; and Contract No. 3— For the maintenance of such street lighting system, including nightly inspection and replacement of lamps." The Company, which alone could supply electric energy in that public service, did not respond by submitting any proposal, but bids were received from another responsible bidder on contracts 2 and 3, thus putting two of the services on a competitive basis. Shortly thereafter as a result of some negotiations, the Company, by letter to the Mayor of Pittsburgh, dated July 15, 1946, submitted a rate per kilowatt hour "at which the Company will supply electric energy for street lighting purposes, and, . . . the charges at which the Company will provide related facilities not covered by the rate for energy." The facilities referred to were not included in the subjects of contracts 2 and 3. In the proposal the Company also set forth a number of conditions on which the proposed charges were based, which for the purposes of this appeal we may regard as having been agreed to by the City. In effect the City agreed to the proposed unit rental charges of the Company for ducts, conduits, cables, junction boxes, extensions of supply lines and transformers. But the proposal of the Company to supply untransformed energy of 7.5 amperage delivered from series circuits to street lighting equipment at 2.5 cents per kilowatt hour was not acceptable to the City. Thereupon the City, believing that the proposed rate for energy was excessive and higher than other comparable charges for service in the Company's tariffs, filed a complaint with the Public Utility Commission praying for a determination of a just and reasonable rate to be charged by the Company for the electric current con-

templated by contract No. 1 and the specifications applicable thereto, as modified by agreement between the Company and the City.

Extensive hearings were held by the Commission and the issues were thoroughly tried. Arguments were heard by the full Commission. About one-half of the Company's gross income is received from customers qualifying for energy at Rate W of the Company's tariffs. Rate W is available only to those having large demands for energy and, as amplified by Rider 2 which offers a reduction in Rate W's demand charges, is available only where the customer takes *untransformed* energy at line voltage. It was obvious from the express provisions of the schedules that Rate W, Rider 2, was not an available rate for street lighting, which required transformed energy of 7.5 amperes distributed by means of interconnecting circuits over a system separate and distinct from that serving Rate W customers. Conceding this, it nevertheless was the City's contention that the separate energy rate for street lighting delivered to the City's fixtures should not exceed in amount, the cost of energy measured by Rate W, Rider 2, delivered to the meters of individual large users in the City of Pittsburgh. On May 11, 1948, the Commission sustained the City's complaint and ordered "That within 30 days after service of this order, Duquesne Light Company, respondent, shall file with the Commission such appropriate modifications or changes to its existing tariff rates as are necessary to provide for the supply of electric energy to the City of Pittsburgh, complainant, as contemplated by contract No. 1, referred to above, subject to the modifications thereof (except as to the price for energy) included in the terms of the counter-offer made by respondent on July 15, 1946; said service to be supplied at a price for electric energy as determined under Rate 'W' and Rider

2 for all series lights and Rates 'C', 'V' or 'W' as applicable for multiple lights." [1]

Thereafter the Company raised the question, which constitutes the difference of opinion giving rise to this controversy, whether it should be required to provide the "interconnecting circuits" required for delivery of street lighting energy without special compensation in rentals or otherwise in addition to the charge for energy under Rate W, Rider 2. In answer to the question the Commission on June 29, 1948, by way of clarifying its former order in that respect, stated: "That Order contemplated . . . the exact service comprehended by Contract No. 1 and the counter-offer, and we merely substituted the Rate 'W' level for the 2.5 cents quoted by respondent." Thus it was made clear that the order of the Commission imposed the obligation on the Company of supplying and maintaining the necessary interconnecting circuits and delivering energy all within Rate W, Rider 2. The effect of these orders of the Commission was to make available in the future an optional rate supplanting Rate S of the tariff, if and when the City should put itself in position to make use of the new rate by pro-

---

[1] It was further ordered that the above tariff modifications or changes as contemplated shall include the following special provisions: "1. Series Street Lights (a) Availability—This schedule applies to the supply of alternating current series, street lighting energy delivered at the street lighting fixtures, at 7.5 amperes unless otherwise agreed upon. (b) Determination of Energy and Connected Load for Billing Purposes—The energy delivered on the primary side of the substation or pole-type constant current transformers and the connected load thereon will be determined for each location by taking the rated wattage of all lamps connected, subject to the rated efficiency of their individual transformers, if any, and subject to values of circuit efficiency of 85% and power factor of 85%. 2. Multiple Street Lights (a) Availability—This schedule applies to the supply of alternating current, multiple street lighting energy delivered to the street lighting fixtures at 115/230 volts unless otherwise agreed upon. The quantity of such energy will be determined for each location from the rated wattage of all lamps connected subject to a value of circuit efficiency of 95%."

viding the facilities contemplated by contracts 2 and 3.

At the outset it is contended that the Commission does not have the power to separate the services and initiate a new rate for the proposed type of street lighting here contemplated. Utility companies in the field of municipal street lighting, almost without exception, have furnished a complete and comprehensive service together with all necessary incidental circuits, fixtures and facilities including the supply and maintenance of lamps. Separation of the service is a modern development of the art. But although the proposal of the City may be novel yet it is not open to practical objection nor can there be valid legal objection to the order on that score. That a split up of the service as contemplated is feasible must be considered as conceded by the Company from the fact that it is willing to supply energy, alone, for a consideration.

A utility company in the exercise of its managerial functions may, in the first instance, determine the type and extent of its service to the public, within the limits of adequacy and reasonableness. Such service however must conform with the regulations and subsequent orders of the Commission, and the utility, on order, is bound to make such changes in its service or facilities as shall be deemed necessary in the public interest. Public Utility Law of May 28, 1937, P. L. 1053, §401, 66 PS §1171. The Commission in this instance had the power to reclassify the services of the appellant and to provide for a separate rate for energy to be supplied to the new lighting system in Pittsburgh. And on complaint of the City, the Commission also had the authority to fix the level of the separate energy rate when it found that the rate demanded by the utility for that service was not just and reasonable. ibid. §412, §301, §309, 66 PS §1182, §1141, §1149. The jurisdiction assumed by the Commission, and its orders in this case were necessary and proper in the exercise of the powers granted

to it in the Public Utility Law, and it is unimportant that the legislature, in the sections above cited, or elsewhere in the Act, may not have contemplated the specific factual situation here presented. The authority conferred by the Act includes powers which are necessary and proper, in addition to those specifically declared, for the regulation of the service and facilities of every public utility and the fixing of just and reasonable rates. *Pittsburgh v. Pa. P.U.C.,* 157 Pa. Superior Ct. 595, 43 A. 2d 348. Under the implied powers, alone, conferred by sections 901 and 902 of the Act, 66 PS §§1341, 1342, the Commission had ample authority on complaint of the City to reclassify the service and to fix the rate to be charged by the Company for energy. Moreover the fact that the rate is optional is no objection to it. Manifestly the City cannot take advantage of the rate until the facilities and services contemplated by contracts 2 and 3 are made available. In the meantime the Company will continue to supply a complete lighting service, as heretofore, under Rate S. The new tariff will be applicable only when the City is in position to limit the service of the Company to the supply of energy. The fixing of a rate to become effective in the future is not prejudicial to the Company, for the rate will always be subject to readjustment under §308 of the Act, 66 PS §1148.

On the merits, the Company contends that the rates, as fixed, are confiscatory and since the order does not contain adequate findings of fact to determine that issue, the case must be returned to the Commission for such findings. Thereafter the Company would ask us to determine the facts as well as the law and fix a higher rate. We cannot agree that the findings are inadequate under the circumstances. The Company in its argument before the Commission asserted that any rate below its offer of 2.5 cents would be inadequate but, as we understand it, the case was not presented to the Commission

on the issue of confiscation, under Rate W as the measure of return. Confiscation was first alleged in this appeal. The Company therefore cannot complain that the Commission's order does not contain detailed findings applicable to that issue. The facts actually, though informally, found by the Commission on the theory of the case as tried below, are adequate. Moreover, the highly technical questions involved in determining the adequacy of the rates presented engineering and accounting problems for the Commission and not for this Court.

The return to the Company under the rates, as ordered by the Commission, will be less than one-half of the anticipated return to the Company on its offer of 2.5 cents per kilowatt hour measured at the lamps. And the Company contends that Rate W, Rider 2, provides a proper charge only for untransformed energy at line voltage; and that the rate can be used as a possible means of determining the price for street lighting energy only when appropriate additions are made to compensate the Company for maintenance expense and return on investment in facilities not incident to the service under Rate W. It is the position of the Company that for the effective control of the energy for the contemplated street lighting service and to permit the daily turning on and off of the lamps, special 7.5 ampere circuits with transformers and control equipment are necessary; and that the investment in these facilities and their maintenance costs are properly assignable entirely to the City since no other customers have need for the service or will benefit thereby. In effect the Company contends that under the rate established by the Commission, it will receive no return on the additional investment or for the services necessary to the delivery of energy for street lighting over and above that of the standard service and untransformed energy contemplated by Rate W.

The Company called five of its employees as witnesses, all of whom were well qualified by training and special knowledge to testify as to what the rate ought to be. Their testimony, supported by studies, estimates and determinations made by them, is to the effect that a reasonable charge for the use of facilities and circuits required to transform and carry the current to the various lamp locations in the City accounts for more than one-half of the offered rate of 2.5 cents, which in their opinion is as low as the City has any reason to demand.

Three witnesses were called by the City. A. R. Brunwasser is a registered engineer of long and varied professional experience, who since 1935 has been the Public Utilities Engineer of Allegheny County. He had an intimate knowledge of all phases of the problem and his competency is not questioned. Fred Kleinman, an accountant by profession, is the Chief of Accountants and Finance of the Illinois Commerce Commission; Arthur M. Dunstan, an electrical engineer, is Chief of the Utilities Section of the Federal Housing Administration. Both of them have had experience in the field of rate making by public service commissions. They did not have the advantage of an intimate knowledge of the Company's affairs as did the Company's witnesses but they nevertheless were qualified to express opinions as to the rate applicable to the service.

The Commission in its order referred to the Company's "estimates of plant investment assignable to series street lighting service supplied" to the City. But the Commission refused to accept "a method of arriving at the level for the energy rate in question" based upon a return on the investment or operating expense of facilities involved. The Commission adopted the opinions of the City's witnesses that charges measured by Rate W were adequate. The reasons assigned by these witnesses supported that conclusion. Among the advantages to the Company accruing from the nature of the service,

as offsets to the cost of necessary special equipment, are the following: the lighting load is a base load with a constant load factor as to demand and energy requirements within a range of hours scheduled in advance; although the Commission found that the load could not properly be classified as off-peak, certainly much of the night service is actually off-peak and the Company will benefit to that extent; there are 12,000 Rate W customers whose service involves sales promotion expense, the supply, installation and reading of 12,000 meters, and billings and collection of accounts, as against the servicing and reading of not more than 17 meters and the billing of one solvent customer for all of the energy supplied. So also, the demands of Rate W customers cannot be charted in advance and are a part of the on-peak load. Moreover, Rate W absorbs some maintenance costs and capital investments peculiar to that service which are comparable in some degree at least to the equipment and labor costs on which the company based its demand for a higher rate. To that extent there would be a duplicate charge in the Company's demand.

The Company has not established "with the clarity and definiteness befitting the case" that the rate established in this case will bring about confiscation. Cf. *Lindheimer v. Illinois Bell Telephone Co.*, 292 U. S. 151, 54 S. Ct. 658, 663. The issue of confiscation is not before us. There is competent and substantial evidence, supporting the Commission's findings and its determination in this case, and we therefore may not disturb the order. Section 1107 of the Public Utility Law, 66 PS §1437 Cf. *Carpenter v. Pa. P.U.C.*, 141 Pa. Superior Ct. 447, 15 A. 2d 473.

Order affirmed