Process Gas Consumers Group, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued January 31, 1984, before President Judge CRUMLISH, JR., and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, DOYLE and BARRY.

*Edward J. Grenier, Jr.,* with him, *Glen S. Howard and James P. Rathvon, Sutherland, Asbill & Brennan,* and *Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, P.C.,* for petitioner.

*Lee E. Morrison, Assistance Counsel,* with him, *Daniel P. Delaney,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Daniel Clearfield,* Assistant Consumer Advocate, with him, *David M. Barasch,* Acting Consumer Advocate, and *Debra Miller,* Legal Assistant, for intervenor, Office of Consumer Advocate.

*John Winship Read,* with him, *Rodney G. Hoffman, Kirkpatrick, Lockhart, Johnson & Hutchison, and Norman J. Kennard and Martha W. Bush,* for intervenor, Allegheny Ludlum Steel Corporation.

OPINION BY JUDGE ROGERS, July 19, 1984:

The Process Gas Consumers Group ("PGCG" or "Consumers Group"), an association of industrial consumers of natural gas including the corporate owners of gas consuming facilities located in this Commonwealth, here seeks review of an Order of the Pennsylvania Public Utility Commission ("PUC" or "Commission") entered November 3, 1982 and requiring each of the Commonwealth's sixteen jurisdictional gas utilities to "submit for [Commission] approval a residential conservation program funded by [the utility's] portion of the accumulated BFR."[1] A description of the general goals to be achieved by the required residential conservation program is contained in the opinion accompanying the Commission's order. The BFR

---

[1] The Commission's November 3, 1982 order is docketed to No. I-79110324.

referred to is a Boiler Fuel Rider required by Commission Order entered and adopted on December 7, 1979 and applicable to large industrial users of gas as a boiler fuel. The BFR is a species of surcharge and has the effect of raising the cost of gas to industrial gas users to the cost of the least expensive alternative boiler fuel—No. 6 high sulfur fuel oil. Funds produced by the imposition of the BFR have been held in escrow by each utility pursuant to the December 7, 1979 Order pending investigation and decision by the Commission as to the appropriate disposition of those funds. We were informed at argument that approximately fifteen million dollars have been, thus far, produced by operation of the BFR.

As indicated, the Commission, in the order here challenged, has determined that the fund produced by the BFR should be expended by each utility in the creation and operation of a program of residential conservation. The consumers group contends that the Commission is without statutory power to require expenditures for such a purpose and that the fund should instead be distributed to the small industrial, commercial, agricultural, and residential gas users unaffected by the BFR.[2] Before commencing our analysis of this contention, we will describe the factual and legal circumstances that prompted the Commission to promulgate the BFR and to determine the disposition of BFR funds described above.

### The National Gas Policy Act of 1978

One of five statutes relating to the consumption of sources of energy enacted by the United States Con-

---

[2] The specification of gas consumers affected and unaffected by the BFR or the "refund" proposed by PGCG is necessarily imprecise at this juncture. The means by which PGCG proposes to accomplish the refund is through each utility's gas cost rate or GCR.

gress in 1978, The National Gas Policy Act,[3] mandates, *inter alia,* a system of incremental pricing intended to ameliorate some of the anticipated adverse effects of federal price deregulation of natural gas producers. Specifically, Title II of the Act[4] requires the Federal Energy Regulatory Commission (FERC) to promulgate by rule a system designed to pass through to large industrial users the increased cost of deregulated gas at the well head. The means by which this goal is accomplished includes surcharges assessed by interstate pipelines and local distribution companies which are calculated to produce a gas cost to the industrial customer no greater than the cost of alternative low grade fuel oil. All such surcharges received by the pipelines and distribution companies are required to be used to offset anticipated increases in the cost of gas to so-called "exempt" or "high priority" gas consumers including residential, commercial, and agricultural users.

As indicated, a fundamental tenet of the federal incremental pricing program is the recognition that the natural gas supplied to industrial boiler fuel users cannot be raised in price beyond that of alternative fuel oil. For this reason, the rate of surcharge collected from each industrial consumer is limited by regulation to no more than the difference in cost of natural gas and No. 6 high sulfur fuel oil, the product of which quantity multiplied by the consumer's energy usage by volume[5] is called the consumer's "maximum surcharge absorption capability" or MSAC.

As a consequence, a non-exempt consumer subject to a state approved tariff which prices natural gas at

---

[3] 15 U.S.C. §§3301-3432.

[4] 15 U.S.C. §§3341-3348.

[5] Measured in British thermal units (BTU's) to permit cross calculations between fossil fuels in different physical states.

the equivalent alternative fuel cost before the imposition of any surcharge has no capacity to absorb any price increment and is denominated a "zero MSAC."

The FERC regulations called for by the NGPA were issued on September 28, 1979. As we have noted, approximately ten weeks later, on December 7, 1979, the Commission initiated the Boiler Fuel Rider. The effect of the BFR was to ensure that all large industrial gas consumers in Pennsylvania are zero-MSAC thereby preventing any surcharge under the NGPA from "flowing back" to out-of-state pipeline companies. As the Commission candidly wrote:

> The Commission believes that the interest of all gas consumers in Pennsylvania can best be achieved by Commission regulatory action directing the establishment of rates, in a uniform fashion, within the existing Pennsylvania regulatory framework, which will enable gas distribution companies to report zero MSAC's. Thus, Pennsylvania can, in effect, "exempt" itself from the Federal incremental pricing program by having gas distribution utility rates which conform the effective rate charged non-exempt industrial boiler fuel load customers to the alternate fuel price established by FERC. Through the establishment of such rates, which would meet the specific characteristics of this state, the Commission estimated that about $10 million dollars, which would otherwise flow back to interstate natural gas pipeline companies, would be retained within the state.[6]

---

[6] Commission opinion accompanying the December 7, 1979 Order at page 3. Pennsylvania was not alone in attempting a regulatory exemption from the "flowback" portion of the NGPA. Some thirty states issued regulations similar to Pennsylvania's BFR.

. With respect to disposition of the funds produced by operation of the BFR, the matter here directly at issue, the Commission in December, 1979, ordered an investigation and the receipt of proposals formulated by interested parties. Hearings were conducted in May and June, 1980 before Administrative Law Judge (ALJ) Charles F. Hoffman and proposals were submitted, most notably, by the Governor's Energy Council,[7] the Commission's trial staff, the Hospital Association of Pennsylvania, and a number of gas consumers including the PGCG.

Insofar as the issues raised by this appeal are concerned, these proposals can be divided into two broad categories. Apart from the consumers and consumer groups including PGCG, evidence was adduced before the ALJ in support of various plans for the expenditure of BFR funds so as to decrease natural gas usage through conservation. The specific plans included insulation grants and subsidized loans with or without provision for low income residential consumers, subsidized energy audits, and financial assistance including grants to hospitals desirous of engaging architectural and other professional technical assistance in attempting to reduce energy usage. Gas consumers, including PGCG, on the other hand, proposed refunding of the BFR revenues to consumers other than those subject to the federal surcharge by means of each utility's GCR. In his extensive recommended de-

---

[7] The Governor's Energy Council was created by Governor Thornburgh's Executive Order No. 1979-7 dated July 19, 1979 and charged with the duty, *inter alia*, "to develop a Comprehensive Energy Plan for the Commonwealth" and "to assist the Governor, other state agencies, and the private sector in the study and review of all energy plans, policies, and programs and to aid in the evaluation of needs, assessments of existing resources, analysis of existing programs, and the development and implementation of new policies and programs." .

cision dated February 27, 1981, ALJ Hoffman found it unnecessary to weigh the relative substitute merits of the various proposals. Instead, the ALJ determined that only those proposals involving GCR refunds were within the power of the Commission to mandate. Specifically, it was recommended

a. That revenues accumulated in escrow accounts by the various jurisdictional gas utilities be flowed to exempt[8] customers through the operation of the utilities' GCR.

'   Following the filing of exceptions and a remand by the Commission at which time ALJ Hoffman reiterated his conviction that expenditure of BFR funds for conservation programs was beyond the Commission's statutory power, the Commission, on November 3, 1982, entered the order here challenged approving broadly the residential conservation plans supported by a number of parties as follows:

IT IS ORDERED:

1. that each affected gas utility shall, within 90 days of the entry date of this Opinion and Order, submit to the Commission for its approval a residential conservation program funded by their portion of the accumulated BFR funds, but which may be supplemented by other utility funds, which contains the programs outlined in Section III of this Opinion and Order [including an audit supplement program, instruction in basic home weatherization improvements, installation of gas water heater insulating jackets, home insulation loan subsidies, and optional programs for commercial and small industrial gas consumers "designed to improve

---

[8] That is, those customers exempt from the operation of the federal NGPA of 1978 including residential, commercial, and industrial gas consumers other than those using gas as a boiler fuel.

the efficiency of natural gas consumption. . . ."]
These programs and corresponding publicity
activities should be designed to effectively spend
currently accumulated BFR funds within two
years from the approval of the individual util-
ity's plan.

Legality of the BFR Under Federal Law

The PGCG does not here directly challenge the
legality of the BFR mechanism which generated the
fund now ordered to be expended for gas conservation
measures. Nevertheless, inasmuch as the existence of
an irreconcilable conflict between the BFR and the
NGPA has been asserted at earlier stages of these pro-
ceedings and is an implicit theme of the challenge here
pressed by PGCG, we will discuss briefly the question
of the validity of the BFR under federal law.

The express goal of the NGPA is at least two-
fold; to more realistically price the natural gas used
by large industrial users while preventing price in-
creases from compelling such users to convert to alter-
native fuels and to at least temporarily shield resi-
dential, commercial, and small industrial gas users
from the inevitable price rises attendant to federal de-
control of gas producers. The mechanism envisioned
by the federal regulators for accomplishing these
goals, as we have discussed, is a surcharge to be levied
on large industrial users which surcharge is explicitly
prohibited from increasing gas prices beyond the point
of economic competition with other fuels together with
the provision of a "flow-back" mechanism for sur-
charge revenues designed to temporarily offset a por-
tion of the inevitable gas price rise to gas users not
surcharged. The BFR and similar responsive mech-
anisms enacted in other states appear at first blush
to be consistent with the first of these goals but at
odds with the second.

For this reason, the validity of state incremental pricing schemes designed to "exempt" the state from operation of the NGPA were quickly challenged in proceedings before the FERC which, following receipt of interested comments, issued the following regulatory amendments effective October 21, 1980:

§282.104[9] State or Local Incremental Pricing Plans.

(a) General Rule. Nothing in this part precludes a state or local government, or agency thereof, from implementing a state or local incremental pricing plan.

(b) Definition. For purposes of this section, a "State or local incremental pricing plan" means a rate plan of a State or local political subdivision, or agency thereof, having authority to establish retail rates for natural gas service in that State or local political subdivision, which rate plan is in effect and requires that retail rates charged by a natural gas supplier for all natural gas used as a boiler fuel . . . be at, or above, the applicable alternative fuel price ceilings established by [FERC pursuant to the NGPA].

Thus, the FERC has determined that state regulatory efforts including Pennsylvania's BFR are not inconsistent with the NGPA. This determination was predicated, in part, on the following portion of the legislative history to the NGPA:

[The NGPA] does not preclude State regulatory agencies from exercising their authority under State law to regulate local distribution companies. A State regulatory agency could, for example, raise prices to be paid by incrementally priced industrial facilities to levels

---

[9] 18 C.F.R. Part 282 (1983).

higher than [the price of alternative low-grade fuel oil]. The conferees have not mandated such a practice; nor has it been precluded. State law is not preempted in this case and States may wish to place more of the costs of service onto a particular class of industrial users.[10]

To date, the determination of the FERC with respect to the legality of state incremental pricing programs is the last word on the subject.[11]

## The Issues

As noted, PGCG does not here contest the legality of the BFR or the fund its operation created. Indeed, PGCG expressly disclaims any such intention. Such a contest would, in any event, have to have been pursued by appeal from the Commission's December 7, 1979 Order establishing the BFR. At this juncture, PGCG challenges only the means adopted by the Commission to dispose of the BFR revenues, the residential gas conservation programs. In this regard PGCG asserts that the Commission's decision adopting the conservation proposals is insufficiently specific as to its supporting legal and factual predicates and that the requirement of such conservation measures to be funded by BFR revenues is unlawfully discriminatory and beyond the Commission's statutory authority.

## Commission's Authority to Require Conservation Measures to be Funded by BFR Revenues

It is axiomatic that the Commission, as an agency of delegated powers created by the legislature, has

---

[10] S. Rep. No. 1126, 95th Cong. 2d Sess. 100-101 (1978).

[11] Two appeals from the FERC decision are pending before the United States Court of Appeal for the D.C. Circuit. *See American Piper Institute v. Federal Energy Regulatory Commission*, No. 81-1071 (D.C. Cir. filed ) and *Glass Packaging Institute v. Federal Energy Regulatory Commission*, No. 81-1135 (D.C. Cir. filed ).

only those powers explicit in the enabling statute, the Pennsylvania Public Utility Code[12] or fairly to be implied as necessary to the exercise of those express powers. *Pennsylvania Public Utility Commission v. Philadelphia Electric Company*, 501 Pa. 153, 460 A.2d 734 (1984); *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981), *allocatur refused*, February 23, 1982.

The Commission here relies for its authority on Section 308(c) of the Code, 66 Pa. C. S. §308(e), together with the authority of such cases as *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 166, 63 A.2d 466 (1949) which have pronounced a degree of administrative flexibility inherent in the Commission's powers so as to permit appropriate regulatory response to unforeseen factual and legal circumstances. Code Section 308(c) creates the Bureau of Conservation, Economics and Energy Planning under the Commission's auspices and provides pertinently:

The Bureau of Conservation, Economics and Energy Planning shall conduct studies and research all matters within the commission's jurisdiction and advise the commission of the results thereof in order to enable the commission to provide prospective regulation in the best interest of all parties concerned. Such studies and research shall include . . . the development of an effective program of energy conservation.

We must agree with the Commission that these statutory provisions evince a legislative intent that matters of conservation and the development of plans for the accomplishment of conservation measures serve

---

[12] 66 Pa. C. S. §308(c).

as a central regulatory concern. However, it is equally obvious that Section 308(c) is insufficient to create in the Commission, without more, the power to require the creation of the fund and the manner of its disposition here challenged. First, the Bureau initiated by Section 308(c) is authorized only to "conduct studies and research. . . ." Second, the studies and research authorized are only to concern "matters within the Commission's jurisdiction" thereby undermining any contention that the provision serves itself to expand the Commission's jurisdictional reach. Finally, there is no indication on this record of any role played by the Bureau of Conservation, Economics and Energy Planning in the design or implementation of these conservation measures.

The issue here presented, however, is not whether the Commission could lawfully order the creation of a fund to be expended in pursuit of conservation but whether, being in control of such a fund as a result of unforeseen developments in governing federal authority, the Commission may mandate expenditures serving a purpose central to the regulatory body's legislated concerns. On this score, the Commission correctly relies on such statements of the broad scope of its necessary powers as is contained in *Duquesne Light Company v. Pennsylvania Public Utility Commission:*

> The jurisdiction assumed by the Commission, and its orders in this case were necessary and proper in the exercise of the powers granted to it in the Public Utility Law, and it is unimportant that the legislature, in sections above cited, or elsewhere in this Act, may not have contemplated the specific factual [or, we add, legal] situations here presented. The authority conferred by the Act includes powers which are necessary and proper, in addition to those spe-

cifically declared, for the regulation of the service and facilities of every public utility. . . .

*Id.* at 172-173, 63 A.2d at 469-470. PGCG argues that even this broad formulation of the Commission's powers cannot embrace the conservation mandate here challenged because the Commission concededly does not have the power to tax for the general welfare liberally defined and because the expenditure of BFR funds in the manner required by the Commission's November 3, 1982 Order is inconsistent with the NGPA.

The first contention must fail for at least two reasons. Primarily, as we have discussed above, the Commission's *creation* of the BFR fund is not now subject to our review. We are not here faced with the question of whether in the absence of the NGPA and its responsive BFR, the complete legality of which must now be assumed, the Commission could require the gas utilities within its jurisdiction to set aside revenues in order to fund energy audits, insulation grants and loans, and technical conservation assistance to commercial and small industrial gas users. We have already opined that Code Section 308(c) appears insufficient to support such a program. However, on the occasion of this appeal we must take as our point of departure the lawful and proper existence of the BFR fund which must be expended in some manner and for some purpose. Moreover, the purpose here fixed upon by the Commission is not, as PGCG would have it, merely an abstract complement to the general good unrelated to the Commission's statutory charge. As we have explored, the Legislature by Section 308(c) has expressly placed the matter of the conservation of limited natural gas supplies at the center of the Commission's regulatory considerations.

Although the parties have not cited it, we also find instructive Section 511.1 of the Code, 66 Pa. C. S. §511.-1 which is as follows:

§511.1. Use of Federal funds under energy program (a) General Rule.—The Commission is authorized to apply for and, subject to appropriation by the General Assembly, use Federal funds pursuant to the National Energy Act which is composed of . . .

. . . .

(4) The "Natural Gas Policy Act of 1978". . . .

. . . .

(7) Any future Federal legislation or amendments to the statutes listed in this subsection providing special funds for:

. . . .

(ii) Energy conservation research and development.

To be sure, Federal funds are not here involved. However, the BFR funds at issue are a direct product of the operation of the federal statute denominated and, as we have indicated, the origin of the fund and the legality and manner of its creation are not matters presently subject to review. With respect to the disposition of monies properly within the jurisdiction of the Commission as a result of the Natural Gas Policy Act, the question generally before us, Section 511.1 speaks quite explicitly and indicates that such monies may be expended for the purpose of energy conservation; not limited to research, but including development of conservation programs.

PGCG also contends that only a refund to all non-BFR consumers through the GCR is consistent with the NGPA's intended disposition of the BFR fund. We must first emphasize that the GCR refund proposal is no more expressly approved by the NGPA than are the conservation proposals adopted by the Commission. Instead, the NGPA is silent as to the

creation of state incremental pricing schemes like the
BFR and gives no guidance as to the manner in which
the funds produced by such schemes must be or ought
to be expended. The NGPA mechanism is one in which
surcharges assessed against large industrial gas con-
sumers "flow-back" to the interstate pipeline sup-
pliers where they result in a reduced purchased gas
cost adjustment rate made a component of the FERC
approved tariff at the federal level. The Commission,
by means of the BFR, has exempted Pennsylvania
from the operation of this program and the reduced
GCR proposal of PGCG and others cannot be con-
sidered a requirement of the federal program now in-
applicable to this Commonwealth.

This conclusion is supported by the analysis of the
federal regulatory authorities. On this issue, the
FERC concluded:

> The [FERC's] regulations do not require
> States to allocate to their residential and other
> high priority users [those users not subject to
> the federal or BFR surcharge] the additional
> revenues collected from their [large industrial
> boiler fuel] users whose rates are raised to, or
> above, the alternative fuel cost ceiling.
>
> Several State commissions argued that the
> additional revenues [e.g. those revenues gen-
> erated by operation of Pennsylvania's BFR]
> must be reallocated so as to lower the rates of
> residential and other high priority users [e.g.
> by means of the reduced GCR proposal of
> PGCG], because one of the purposes of Title II
> of the NGPA is to shield those users.
>
> Although the [FERC] anticipates . . . that
> States with their own incremental pricing
> plans will endeavor to shield residential and

other high priority users from higher gas prices to the extent possible under State law, the [FERC] cannot legally require States to channel the additional revenues to those high priority users. The incremental pricing program under Title II of the NGPA does not apply to residential and other high priority users of natural gas. Consequently, the traditional State retail ratemaking authority as to those users is undisturbed and the State may establish rates for those users in any manner consistent with State law. The [FERC] has no authority to require a State to channel to residential and other high priority users any increased revenues collected as a result of that State's implementation of its own incremental pricing plan.

Thus, the federal regulatory authority primarily charged with enforcing the NGPA has determined that that Act is not violated by nor is it inconsistent with the disposition of funds produced by state incremental pricing other than as refunds to residential, commercial, and small industrial users. We have been offered no persuasive reason to disagree.

Additionally, there is evidence on this record lending substantial support to the Commission's conclusion that BFR funded conservation plans serve the NGPA's goal of shielding residential gas users from the adverse effect of producer price deregulation. The Commission wrote:

We believe that these conservation programs can offer monetary savings for utility customers far in excess of the existing funds available for distribution. Further, as these programs reduce the participating customers' need for natural gas, utilities may be able to avoid purchasing relatively more expensive new gas supplies.

This should reduce the future average cost of gas for all customers.

This finding is supported, *inter alia*, by the expert testimony of Robert A. Shinn, Executive Director of the Governor's Energy Council who testified that the GCR refund proposal would "artificially stimulate and subsidize uneconomic demand for natural gas in one class of customers at the expense of another" and would "add further distortion to an already perverse pricing scheme which encourages uneconomic uses of natural gas."[13] To the same effect, Diane L. Warriner, Senior Utility Economist with the policy division of the Governor's Energy Council testified as follows:

> The [BFR] funds should be used to provide low interest financing for investment in energy efficiency and conservation measures. These funds should not be used to reduce the Gas Cost Rate (GCR) on gas for [surcharge] exempt classes.
>
> . . . .
>
> A reduction in gas prices (which are already below replacement cost) will work against a common national energy policy goal shared by this Administration and the Public Utility Commission—energy conservation. It will also signal a continuation of a thoroughly discredited policy of artifically subsidizing one class of customers at the expense of another and which [sic?] holds natural gas prices well below the market clearing level (discussion of authorities omitted).
>
> . . . .
>
> By reserving these [BFR] funds to finance cost-effective conservation measures, the PUC

---

[13] For a discussion of this testimony see ALJ Hoffman's February 27, 1981 recommended decision at page 9.

> would reduce future customer and utility energy costs. The implication of several recent PUC proceedings is that conservation investments are beneficial in that they limit new gas demands which can only be supported at costs greater than current average rates. The economic wisdom of phased gas price deregulation and energy conservation incentives has been well established in Congressional deliberations and in a number of recent energy policy studies (discussion of authorities omitted).

The Commission's finding that programs of energy conservation will most effectively serve the NGPA's goal of insulating residential gas consumers from inevitable producer price increases, as supported by substantial evidence of record, is binding on this Court. *Miles v. Pennsylvania Public Utility Commission,* 73 Pa. Commonwealth Ct. 53, 457 A.2d 221 (1983); *Fusaro v. Pennsylvania Public Utility Commission,* 34 Pa. Commonwealth Ct. 14, 382 A.2d 794 (1978); *Pennsylvania Public Utility Commission v. Purolator Courier Corp.,* 24 Pa. Commonwealth Ct. 301, 355 A.2d 850 (1976).

We conclude that the Commission's powers are sufficiently broad to permit the mandated conservation expenditures. We are required to here assume the legality of the creation of the BFR fund and this record contains adequate support for the Commission's determination that the mandated disposition of this fund is at least as consistent with the governing federal statutory authority as is any alternative proposed by any party to these proceedings. PGCG invites this Court to substitute judicial discretion for the administrative expertise here exercised. The law does not permit us to accept.

## Discrimination

PGCG additionally contends that particular conservation plans and programs to be filed by individual utilities in compliance with the Commission's November 3, 1982 Order will unlawfully discriminate against classes of gas consumers. Specifically, PGCG describes the situation of a hypothetical consumer who has voluntarily and at his own expense engaged in the conservation measures which are now ordered to be subsidized by BFR funds. As to such a consumer as well as to those consumers who apply for but do not receive limited BFR funds and as to all commercial, agricultural, and small industrial gas customers who will not be eligible for the primarily residential conservation programs envisioned by the Commission's Order, PGCG asserts that the disposition of BFR funds here required violates the proscription against discrimination formulated by the Superior Court in *Alpha Portland Cement Co. v. Public Service Commission,* 84 Pa. Superior Ct. 255, 272 (1925) as follows:

Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be not only advantage to one but a resulting injury to another. Such an injury may arise from collecting from one more than a reasonable rate to him in order to make up for an inadequate rate charged to another. . . .

Two considerations require us to reject this challenge. First, there is no indication on this record that any consumer is or will be charged an excessive rate for gas service. The BFR fund, the disposition of which is here at issue, is the product of charges exacted from large industrial customers which in the absence of the BFR would pay precisely the same price for the boiler fuel. The NGPA requires that boiler fuel gas be equivalently priced with alternative fuel

oil. This is also the price accomplished by the BFR. Simply put, it is discriminatory rates which are forbidden. *See, e.g.,* Section 1304 of the Public Utility Code, 66 Pa. C. S. §1304 ("No public utility shall, *as to rates,* make or grant any unreasonable preference or advantage to any person. . . . No public utility shall establish or maintain any unreasonable difference *as to rates. . .*" (emphasis added)). The industrial boiler fuel rates produced by the BFR are mandated by federal law and, as PGCG elsewhere concedes, are insulated on that account from challenge under state law. The applicable rates of all other customers remain those established in general rate proceedings before the Commission. PGCG brings to our attention no authority, and we have found none, that would invalidate as unlawfully discriminatory the refusal of the Commission or any utility to artificially lower the rate charged any customer below that necessary to provide a fair return to the utility.

We are also unwilling to now finally decide abstract legal questions founded on hypothetical considerations. No particular conservation plan is before us. No particular dispositional program can be analyzed. Whether any such plan, when approved by the Commission and put into effect, will unlawfully discriminate against any customer or class of customers cannot now be determined. This question is not ripe for decision.[14]

### Adequacy of the Commission's Opinion

Finally, PGCG contends that the decision of the Commission accompanying its November 3, 1982 Or-

---

[14] Our resolution of this issue makes it unnecessary to decide the Consumer Advocate's Motion to Quash that portion of PGCG's brief challenging the specificity of the Commission's adjudication.

der inadequately explains the factual and legal conclusions on which the Order is predicated and thereby violates Section 703(e) of the Code, 66 Pa. C. S. §703-(e) which is as follows:

> (e) Decisions by commission.—After the conclusion of the hearing, the commission shall make and file its findings and order with its opinion, if any. Its findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence. . . .

As the statutory language indicates, this provision is for the purpose of aiding the reviewing Court. *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983). In this regard, the factual findings of the Commission are sufficient for review if the controverted issues may be discerned, together with the weight given by the Commission to the disputed evidence, and the manner in which the Commission's conclusion follows from its assessment of the evidence. *Mobilfone of Northeastern Pennsylvania, Inc., v. Pennsylvania Public Utility Commission,* 73 Pa. Commonwealth Ct. 340, 458 A.2d 1030 (1983); *Philboro Coach Corp. v. Pennsylvania Public Utility Commission,* 67 Pa. Commonwealth Ct. 176, 446 A.2d 725 (1982). Numbered, formal factual findings are not required. *Mobilfone of Northeastern Pennsylvania; Purolator Courier Corp. v. Pennsylvania Public Utility Commission,* 51 Pa. Commonwealth Ct. 377, 414 A.2d 450 (1980). The Commission's full explanation of the choices open to it and of the nature of its decision amounts to an implicit acceptance of the thesis of the party which prevailed and a rejection of the contentions of the remaining parties. *UGI Corp. v. Penn-*

98

*sylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980).

The Commission's opinion in the instant case is some fifteen pages in length and describes in considerable detail the procedural history of the proceedings, the positions of the parties, the various proposals made for the disposition of the BFR funds, the factual and theoretical support for the Commission's rejection of the ALJ's recommended disposition by means of each utility's GCR, and the general nature of the conservation programs to be specified and operated by the utilities. The decision is completely adequate for the purpose of our review and we, therefore:
Affirm.

ORDER

AND Now, this 19th day of July, 1984, the Order of the Pennsylvania Public Utility Commission adopted August 13, 1982 and entered November 3, 1982 is hereby affirmed.