511 A.2d 1315

PROCESS GAS CONSUMERS GROUP, Appellant,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee,

David M. Barasch, Consumer Advocate of PA, Intervenor.

Supreme Court of Pennsylvania.

Argued Dec. 3, 1985.
Decided June 20, 1986.

Stephen A. George, Pittsburgh, for appellant.

Glen S. Howard, Pro Hac Vice.

Charles F. Hoffman, Chief Counsel, Lee C. Morrison, Asst. Chief Counsel, Harrisburg, for Pa. PUC.

Robert E. Kelly, Jr., Harrisburg, for Hospital Assn. of Pa.

Daniel Clearfield, Harrisburg, Debra M. Kriete, for Consumer Advocate.

John Winship Read, Pittsburgh, for Allegheny Ludlum Steel.

Maurice A. Frater, Harrisburg, for Carnegie Natural Gas.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

This appeal is from the order of the Commonwealth Court 84 P.Cmwlth. 76, 480 A.2d 1273, affirming the order of the Pennsylvania Public Utility Commission. The Commission had directed affected gas utilities to submit residential conservation programs to be funded by accumulated surcharges placed on specified natural gas industrial consumers.

Appellant, the Process Gas Consumers Group (hereinafter "PGCG"),[1] raises the fundamental issue of whether the Public Utility Commission (hereinafter "PUC") exceeded its delegated authority by ordering surcharge revenues to be used to fund residential conservation programs. An analysis of the events from which the Commission's action precipitated is necessary to understand the respective parties' contentions.

In response to the deregulation of natural gas in this country Congress enacted the Natural Gas Policy Act of 1978[2] (hereinafter "NGPA"), mandating a system of incremental pricing intended to rectify some of the anticipated adverse effects of deregulation.

---

1. PGCG is an association of industrial consumers of natural gas which own and operate facilities throughout the nation, including Pennsylvania. PGCG participates in individual regulatory and judicial proceedings through *ad hoc* committees. The members of the *ad hoc* committee participating in the instant proceeding include: American Standard, Inc., Armco, Inc., Bethlehem Steel Corporation, Borg-Warner Corporation, Cone Mills Corporation, General Motors Corporation, and United States Steel Corporation.

2. Pub.L. 95–621, § 2, Nov. 9, 1978, 92 Stat. 3352. 15 U.S.C. § 3301, *et seq.*

The NGPA dictated that certain large industrial consumers, specifically those who used natural gas as a boiler fuel, were to pay surcharges to utility companies in each state.[3] These companies would, in turn, pay "upstream" to interstate pipelines. Once received by the pipelines, the revenues would be used to reduce the rates of eligible consumers in the states served by the pipeline (including Pennsylvania). Eligible consumers included all consumers except those who use the natural gas as boiler fuel, but even the latter would be entitled to a rate reduction to the extent that they consumed gas in non-boiler uses. Thus, the surcharge imposed by the NGPA entitled eligible Pennsylvania consumers to share in the pipeline's rate reductions for the entire nation.

On December 7, 1979, in response to the NGPA, the Pennsylvania PUC (appellee) ordered jurisdictional utility companies to file a tariff, known as the Boiler Fuel Rider (hereinafter "BFR") surcharge, upon industrial consumers with "non-exempt" status as established by the aforementioned NGPA federal standards. This surcharge was set at the exact amount necessary to eliminate any gap between the base industrial gas rate and the maximum rate allowed under the federal program. The result was that it was impossible to implement the federal surcharge without exceeding the federally prescribed maximum rate.

The effect of the BFR surcharge was to preempt the federal program in Pennsylvania, allowing the funds collected therefrom to remain entirely within the state.[4] However, by adding the BFR surcharge to the base industrial

3. The rate surcharge collected is limited under the NGPA to no more than the difference in cost of natural gas and no. 6 high sulphur fuel oil. The fundamental tenet of this incremental pricing program is that the natural gas supplied to the industrial boiler fuel users cannot be raised in price beyond that of alternative fuel oil (no. 6 high sulphur fuel oil).

4. Twenty-nine (29) other states have imposed a surcharge similar to the one at issue here. The legality of this pre-emption was challenged before the Federal Energy Regulatory Commission which issued the following regulatory amendments:

rates being charged by the Pennsylvania gas utilities, the resulting revenue possessed no relation to the utility companies' individual revenue requirements. Consequently, each company was ordered under the 1979 decree to place all additional monies, resulting from the BFR surcharge, in an interest bearing escrow account. The account is presently in excess of $15 million.

A hearing was held in 1980 before an administrative law judge to determine the proper method for distribution of the funds being held in escrow. On February 27, 1981, a decision was entered recommending certain minor alterations in the manner of collecting the BFR surcharge, along with a proposal for the distribution of the fund. A refund to eligible consumers through calculations based on the Gas Cost Rate was found to be most closely in conformance with the federal plan, and within the scope of the Public Utility Code.[5] Furthermore, this "flow-back" method of distribution was found to result in the utility companies collecting an amount from the consumers equal to their revenue requirements.

> § 282.104   State or Local Incremental Pricing Plans.
>    (a) General rule.   Nothing in this part precludes a State or local government, or agency thereof, from implementing a State or local incremental pricing plan.
>    (b) Definition.   For purposes of this section, a "State or Local incremental pricing plan" means a rate plan of a State or local political subdivision, or agency thereof, having authority to establish retail rates for natural gas service in that State or local political subdivision, which rate plan is in effect and requires that retail rates charged by a natural gas supplier for all natural gas used as boiler fuel by nonexempt industrial boiler fuel facilities (subject to the retail ratemaking authority of the State or local political subdivision, or agency thereof) be at, or above, the applicable alternative fuel price ceilings established by the Commission under Subpart D of this part.
> 18 C.F.R. Part 282.104 (1983).
>    The matter is currently being contested in federal court and is not at issue in the instant appeal. *See American Piper Institute v. Federal Energy Regulatory Commission,* No. 81–1071 (D.C.Cir.); *Glass Packaging Institute v. Federal Energy Regulatory Commission,* No. 81–1135 (D.C.Cir.).

**5.**  Act of July 1, 1978, P.L. 598, No. 116 § 1 *et seq.,* 66 Pa.C.S. § 101 *et seq.*

An alternative proposal, and the one at issue here, providing for the implementation of conservation programs funded by the BRF surcharges, was rejected by the hearing judge as being beyond conventional ratemaking, and outside the expressed or implied powers granted the PUC through the Public Utility Code. The conservation proposal was also found to be unreasonably discriminatory in violation of section 1304 of the Public Utility Code.[6]

After reviewing the administrative law judge's findings, the PUC remanded the matter back to the judge on July 26, 1981, for additional evidence. On April 6, 1982, the administrative law judge issued a Recommended Decision Upon Remand, finding that nothing had occurred since his first recommended decision that warranted a change in the decision.

The PUC once again rejected the administrative law judge's recommended decision and entered an opinion stating the reasons therefore on November 3, 1982. In the opinion, the PUC reasoned that since the NGPA is not the sole authority for the institution of the BFR rider, it cannot be the controlling factor in determining how any excess revenues granted by the BFR surcharge are to be disposed of. Instead, the PUC decided to establish three (3) programs aimed at the long-term effect of conservation, finding that the legislature had conferred upon it a duty to promote energy conservation with the enactment of § 308(c) of the Public Utility Code.[7]

In response, the PGCG filed a Motion to Stay Pending Judicial Review. The PUC denied the PGCG's Motion on January 7, 1983, but the Commonwealth Court subsequently granted the motion on January 28, 1983. On August 23, 1983, this Court affirmed the issuance of the stay. *See Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (1983).

6.  66 Pa.C.S. § 1304.
7.  66 Pa.C.S. § 308(c).

The Commonwealth Court eventually affirmed the PUC's order authorizing the implementation of conservation programs and thereafter granted the PGCG's motion to stay the PUC's order pending proceedings before this Court. *Process Gas Consumers Group v. Pennsylvania Public Utility Commission,* 84 Pa.Cmwlth.Ct. 76, 480 A.2d 1273 (1984). In affirming the PUC's order, the Commonwealth Court acknowledged that § 308(c), governing the PUC's authority in conservation matters, is insufficient to create, without more, the power to establish and dispose of a fund similar to the one challenged at bar. Nevertheless, despite this lack of authority, the court found the creation of the BFR surcharge fund to be legitimate because it did not result from the PUC's direct action, but rather from an "unforeseen development in governing federal authority." *Id.,* 84 Pa.Cmwlth. at 88, 480 A.2d at 1280. As to the disposition of the funds, the court reasoned that § 511.1 [8] of the Public Utility Code authorized the PUC to dispose of monies properly within its jurisdiction.

Upon petition for allowance of appeal, we granted allocatur. We now reverse.

In this appeal, appellant, PGCG, contends that the PUC exceeded the ratemaking authority granted it under the Public Utility Code by requiring that excess rate revenues be used to fund conservation programs instead of being used to directly reduce the rate of eligible gas consumers; and that the act of increasing utility revenues by preempting a federal program, and then using the funds to promote a plan outside the ratemaking process, borders on taxation, a non-delegable power vested only in the General Assembly.

Appellees, the PUC, along with Intervenor, the Consumer Advocate of Pennsylvania, counters that the order directing the implementation of conservation programs funded by the BFR surcharges is in compliance with the Public Utility Code. They further argue that the PUC has the authority, as a matter of law, to direct utility conservation programs and to approve the expense of such programs.

8. 66 Pa.C.S.A. § 511.1.

The parties agree that the legality of the BFR fund itself is not at issue, for as previously stated, the matter is currently being contested in Federal Court. *See* fn. 4 *supra* at 1317. However, the accepted legality of the fund does not obviate inquiry by this Court into the creation and disposition of that fund.

The threshold inquiry is whether the BFR fund was created by federal action or by the action of the PUC. The PUC contends the fund was a result of the federal act; whereas the PGCG maintains the fund was created by a direct order on behalf of the PUC. The significance of this issue is that if the fund was created by an action of the PUC, then that agency cannot claim that they are merely administering a fund which was thrust upon them.

█  As noted above, the fund in question came into being as a result of the December 7, 1979 order of the PUC, directing utility companies to file tariffs. Attached to the order, the PUC provided the following explanation for the imposition of the BFR surcharges:

> The Commission believes that the interest of all gas consumers in Pennsylvania can best be achieved by Commission regulatory action directing the establishment of rates, in a uniform fashion, within the existing Pennsylvania regulatory framework, which will enable gas distribution companies to report zero MSAC's. Thus, Pennsylvania can, in effect, "exempt" itself from the Federal incremental pricing which conform the effective rate charged non-exempt industrial boiler fuel load customers to the alternate fuel price established by FERC.

Obviously, but for the *direct* action of the PUC, there would be no fund within the PUC's jurisdiction, and therefore their claim that the money in question was more like "found money" must fall on deaf ears.

As to the disposition of the fund, the PUC's argument that they were merely acting within their statutory powers is equally unpersuasive.

The control the General Assembly possesses over an administrative commission has been firmly established by this Court:

> The only safe and proper roads for administrative bodies like the present commission to travel are those plainly marked by the acts of assembly defining their duties, and to these the courts must confine them, if the system represented by such commissions—to which our body politic seems committed—is to work out as intended by its creators, the legislature.

*Swarthmore Borough v. Public Service Commission,* 277 Pa. 472, 478, 121 A. 488, 490 (1923). Thus, the grant of power by the legislature to an administrative commission must be precise. "The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable. A doubtful power does not exist. Such tribunals are extra judicial. They should act within the strict and exact limits defined." *Green v. Milk Control Commission,* 340 Pa. 1, 3, 16 A.2d 9, 9 (1940) *cert. denied* 312 U.S. 708, 61 S.Ct. 826, 85 L.Ed. 1140 (1941). *See also Judge v. Allentown and Sacred Heart Hospital Center,* 506 Pa. 636, 640; 487 A.2d 817, 819 (1985); *Murphy v. Pennsylvania Human Relations Commission,* 506 Pa. 549, 486 A.2d 388 (1985), *appeal dismissed,* —— U.S. ——, 105 S.Ct. 2669, 86 L.Ed.2d 689 (1985); *Pennsylvania Human Relations Commission v. St. Joe Minerals Corporation,* 476 Pa. 302, 382 A.2d 731 (1978).

The general powers of the PUC are set out in the Public Utility Code which provides in pertinent part:

§ 501. General Powers

(a) Enforcement of provisions of part. In addition to any powers expressly enumerated in this part, the commission shall have full power and authority, and it shall be its duty to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of this part, and the full intent thereof' and shall have the power to rescind or modify any such regulations or orders. The express enumeration of the

powers of the commission in this part shall not exclude any power which the commission would otherwise have under any of the provisions of this part.

(b) Administrative authority and regulations. The commission shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The commission may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

66 Pa.C.S. § 501.

It is the PUC's position that the regulations promulgated in this instance were "necessary or proper in the exercise of its powers." This Court has examined this necessity argument in other agency contexts. In *Hospital Association of Pennsylvania v. MacLeod*, 487 Pa. 516, 410 A.2d 731 (1980), we were confronted with the question of whether the Secretary and Department of Health had the authority under the Public Welfare Code to promulgate regulations dealing with the administration of various hospital services. It was determined that the Code provided the Secretary and Department with the supervisory power over the facilities in question, reasoning that "substantive rulemaking is a widely used administrative practice, and its use should be upheld whenever the statutory delegation can reasonably be construed to authorize it." *Id.*, 487 Pa. at 521, 410 A.2d at 733 (citations omitted).

Subsequently, in *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 422 A.2d 487 (1980), regulations which established jockey fees were upheld because the Act in question "reflect[ed] a clear legislative policy to vest the Commission with broad general supervisory powers over the previously unlawful activity of thoroughbred horse racing." *Id.*, 492 at 96, 422 A.2d 489. The Court recognized the requirement that a legislative delegation of power must be clear and unambiguous. Yet, it was acknowledged that "we are not limited to the mere letter of law, but must look to the underlying purpose of the statute and its reasonable

effect." *Id.*, 492 at 97, 422 A.2d at 490.  The purpose of the Act in *Gilligan* was "to provide for and regulate thoroughbred horse racing and parimutual wagering thereon." *Id.* The Commission's regulations, which guaranteed fees for jockeys, was found to fall within the Commission's supervisory powers under the Act by deterring criminal activity.

■■■    In the case at bar, the PUC attempts to justify the actions by relying on Section 308(c) of the Code.  That section provides:

§ 308.  BUREAUS

.    .    .    .    .

(c) Bureau of Conservation, Economics and Energy Planning.  The Bureau of Conservation, Economics and Energy Planning shall conduct studies and research all matters within the commission's jurisdiction and advise the commission of the results thereof in order to enable the commission to provide prospective regulation in the best interest of all parties concerned.  Such studies and research shall include long range forecasting of energy needs and development;  research into the use of new, efficient and economic methods of energy production;  the review of the efficiency of the present generating systems operated within this Commonwealth;  and the development of an effective program of energy conservation. The commission shall, by rule, prescribe guidelines for the form and manner of such annual conservation report which report shall describe the current and proposed programs of each such utility designed to educate and encourage its customers in the optimum, effective and efficient use by them of electric and gas energy.  The report shall include an accounting of the monetary and personnel resources actually or proposed to be expended or devoted to and the actual or anticipated results of such programs.  The bureau shall review all proposals for electric and gas public utility plan expansion and shall submit for consideration of the commission its findings on what impact, if any, the electric and gas public utility

plan expansion will have on rates charged by the public utility.

66 Pa.C.S. § 308(c). However, the PUC reliance on this section is misplaced. By the terms of this statute, the PUC is only empowered to direct a bureau to conduct research in the area of conservation to enable the efficient use of energy through the regulatory process. It does not empower the PUC to create funds, or to mandate programs to utilize those funds. Nor can the PUC rely on the federal law in support of its decision to enact these programs, since the NGPA specifically provided for the disposition of funds created from the surcharge by reducing the rates of eligible customers. We also note that not one of the other jurisdictions which have enacted similar state surcharges has done anything other than to use the funds to lower its customers' rates.

■ In conclusion, though the PUC proposals are laudatory in showing concern for the earth's resources, their execution requires the legislative powers of taxation and appropriation. These powers are not within the PUC's delegated authority.[9]

Accordingly, we reverse the order of the Commonwealth Court and remand to the PUC for disposition consistent with this opinion.[10]

**9.** In an analogous matter, the Commonwealth Court has aptly noted that:

[R]ate making should not be made more difficult by the employment in the process of personal socio-economic theories or, indeed, any consideration other than of the law and the facts of record. Decisions concerning the kind and extent of subsidy which should be afforded to needy residential customers should, it seems, be left by regulatory agencies and courts to the legislative branch of government, ...

*United States Steel Corporation v. Pennsylvania Public Utility Commission,* 37 Pa.Cmwlth.Ct. 173, 185, 390 A.2d 865, 871 (1978).

**10.** The PGCG also argued that the application of the BFR surcharge fund to conservation programs affecting only eligible consumers is a discriminatory form of ratemaking and contrary to the Public Utility Code. *See* 66 Pa.C.S.A. § 1304. Due to the fact that we find the proposed disposition of the fund outside of the granted powers of the PUC, it is unnecessary for us to address the issue of discrimination.

## JUDGMENT

ON CONSIDERATION WHEREOF, it is now hereby ordered and adjudged by this Court that the Order of the Commonwealth Court is reversed and remanded to the PUC for disposition consistent with this opinion.